O'LONE, ADMINISTRATOR, LEESBURG PRISON
COMPLEX, ET AL. *v*. ESTATE OF SHABAZZ ET AL.

No. 85–1722.   Argued March 24, 1987—Decided June 9, 1987

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, POWELL, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 354.

*Laurie M. Hodian*, Deputy Attorney General of New Jersey, argued the cause for petitioners. With her on the briefs were *W. Cary Edwards*, Attorney General, and *James J. Ciancia*, Assistant Attorney General.

*Roger Clegg* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Weld*, and *Deputy Solicitor General Bryson*.

*James Katz* argued the cause and filed a brief for respondents.*

---

*A brief of *amici curiae* urging reversal was filed for the Commonwealth of Pennsylvania et al. by *LeRoy S. Zimmerman*, Attorney General

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case requires us to consider once again the standard of review for prison regulations claimed to inhibit the exercise of constitutional rights. Respondents, members of the Is-

of Pennsylvania, *Amy Zapp*, Deputy Attorney General, *John G. Knorr III*, Senior Deputy Attorney General, and *Andrew S. Gordon*, Chief Deputy Attorney General, *Charles A. Graddick*, Attorney General of Alabama, *Ronald W. Lorensen*, Acting Attorney General of Alaska, *Robert K. Corbin*, Attorney General of Arizona, *Steven Clark*, Attorney General of Arkansas, *John K. Van de Kamp*, Attorney General of California, *Duane Woodard*, Attorney General of Colorado, *Charles M. Oberly III*, Attorney General of Delaware, *Jim Smith*, Attorney General of Florida, *Corinne K. A. Watanabe*, Attorney General of Hawaii, *James T. Jones*, Attorney General of Idaho, *Linley E. Pearson*, Attorney General of Indiana, *Robert P. Stephan*, Attorney General of Kansas, *William J. Guste, Jr.*, Attorney General of Louisiana, *Stephen H. Sachs*, Attorney General of Maryland, *Francis X. Bellotti*, Attorney General of Massachusetts, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Edwin Lloyd Pittman*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Robert M. Spire*, Attorney General of Nebraska, *Brian McKay*, Attorney General of Nevada, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Dave Frohnmayer*, Attorney General of Oregon, *T. Travis Medlock*, Attorney General of South Carolina, *Mark V. Meierhenry*, Attorney General of South Dakota, *W. J. Michael Cody*, Attorney General of Tennessee, *Mary Sue Terry*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, *A. G. McClintock*, Attorney General of Wyoming, and *James R. Murphy*, Acting Corporate Counsel of the District of Columbia.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Eric Neisser, Alvin J. Bronstein, David B. Goldstein, Edward I. Koren,* and *Elizabeth Alexander;* for the American Jewish Congress et al. by *Marc D. Stern* and *Amy Adelson;* for the Catholic League for Religious and Civil Rights et al. by *Steven Frederick McDowell;* for the Christian Legal Society et al. by *Michael J. Woodruff* and *Samuel E. Ericsson;* for the Prisoners' Rights Project of the Legal Aid Society of the city of New York et al. by *Philip L. Weinstein, David A. Lewis,* and *Stephen M. Latimer;* for Imam Jamil Abdullah Al-Amin et al. by *Ellen J. Winner, James G. Abourezk,* and *Albert P. Mokhiber;* and for Len Marek et al. by *Steven C. Moore* and *Walter R. Echo-Hawk.*

lamic faith, were prisoners in New Jersey's Leesburg State Prison.[1] They challenged policies adopted by prison officials which resulted in their inability to attend Jumu'ah, a weekly Muslim congregational service regularly held in the main prison building and in a separate facility known as "the Farm." Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer. See Koran 62: 9–10; Brief for Imam Jamil Abdullah Al-Amin et al. as *Amici Curiae* 18–31. There is no question that respondents' sincerely held religious beliefs compelled attendance at Jumu'ah. We hold that the prison regulations here challenged did not violate respondents' rights under the Free Exercise Clause of the First Amendment to the United States Constitution.

Inmates at Leesburg are placed in one of three custody classifications. Maximum security and "gang minimum" security inmates are housed in the main prison building, and those with the lowest classification—full minimum—live in "the Farm." Both respondents were classified as gang minimum security prisoners when this suit was filed, and respondent Mateen was later classified as full minimum.

Several changes in prison policy prompted this litigation. In April 1983, the New Jersey Department of Corrections issued Standard 853, which provided that inmates could no longer move directly from maximum security to full minimum status, but were instead required to first spend a period of time in the intermediate gang minimum status. App. 147. This change was designed to redress problems that had arisen when inmates were transferred directly from the restrictive maximum security status to full minimum status, with its markedly higher level of freedom. Because of serious overcrowding in the main building, Standard 853 further mandated that gang minimum inmates ordinarily be assigned jobs outside the main building. *Ibid.* These inmates work in details of 8 to 15 persons, supervised by one guard.

---

[1] Respondent Shabazz died on January 15, 1986.

Standard 853 also required that full minimum inmates work outside the main institution, whether on or off prison grounds, or in a satellite building such as the Farm. *Ibid.*

Corrections officials at Leesburg implemented these policies gradually and, as the District Court noted, with some difficulty. *Shabazz* v. *O'Lone,* 595 F. Supp. 928, 929 (NJ 1984). In the initial stages of outside work details for gang minimum prisoners, officials apparently allowed some Muslim inmates to work inside the main building on Fridays so that they could attend Jumu'ah. This alternative was eventually eliminated in March 1984, in light of the directive of Standard 853 that all gang minimum inmates work outside the main building.

Significant problems arose with those inmates assigned to outside work details. Some avoided reporting for their assignments, while others found reasons for returning to the main building during the course of the workday (including their desire to attend religious services). Evidence showed that the return of prisoners during the day resulted in security risks and administrative burdens that prison officials found unacceptable. Because details of inmates were supervised by only one guard, the whole detail was forced to return to the main gate when one prisoner desired to return to the facility. The gate was the site of all incoming foot and vehicle traffic during the day, and prison officials viewed it as a high security risk area. When an inmate returned, vehicle traffic was delayed while the inmate was logged in and searched.

In response to these burdens, Leesburg officials took steps to ensure that those assigned to outside details remained there for the whole day. Thus, arrangements were made to have lunch and required medications brought out to the prisoners, and appointments with doctors and social workers were scheduled for the late afternoon. These changes proved insufficient, however, and prison officials began to study alternatives. After consulting with the director of social services, the director of professional services, and the

prison's imam and chaplain, prison officials in March 1984 issued a policy memorandum which prohibited inmates assigned to outside work details from returning to the prison during the day except in the case of emergency.

The prohibition of returns prevented Muslims assigned to outside work details from attending Jumu'ah. Respondents filed suit under 42 U. S. C. § 1983, alleging that the prison policies unconstitutionally denied them their Free Exercise rights under the First Amendment, as applied to the States through the Fourteenth Amendment. The District Court, applying the standards announced in an earlier decision of the Court of Appeals for the Third Circuit, concluded that no constitutional violation had occurred. The District Court decided that Standard 853 and the March 1984 prohibition on returns "plausibly advance" the goals of security, order, and rehabilitation. 595 F. Supp., at 934. It rejected alternative arrangements suggested by respondents, finding that "no less restrictive alternative could be adopted without potentially compromising a legitimate institutional objective." *Ibid.*

The Court of Appeals, *sua sponte* hearing the case en banc, decided that its earlier decision relied upon by the District Court was not sufficiently protective of prisoners' free exercise rights, and went on to state that prison policies could be sustained only if:

> "the state . . . show[s] that the challenged regulations were intended to serve, and do serve, the important penological goal of security, and that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems. The expert testimony of prison officials should be given due weight, but such testimony is not dispositive of the issue whether no reasonable adjustment is possible. . . . Where it is found that reasonable methods of accommodation can be adopted without sacrificing either the state's interest in security or the prisoners' interest

in freely exercising their religious rights, the state's refusal to allow the observance of a central religious practice cannot be justified and violates the prisoner's first amendment rights." *Shabazz* v. *O'Lone,* 782 F. 2d 416, 420 (CA3 1986) (footnotes omitted).

In considering whether a potential method of accommodation is reasonable, the court added, relevant factors include cost, the effects of overcrowding, understaffing, and inmates' demonstrated proclivity to unruly conduct. See *id.,* at 420, n. 3. The case was remanded to the District Court for reconsideration under the standards enumerated in the opinion. We granted certiorari to consider the important federal constitutional issues presented by the Court of Appeals' decision, and to resolve apparent confusion among the Courts of Appeals on the proper standards to be applied in considering prisoners' free exercise claims. 479 U. S. 881 (1986).

Several general principles guide our consideration of the issues presented here. First, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell* v. *Wolfish,* 441 U. S. 520, 545 (1979). See *Turner* v. *Safley, ante,* at 84; *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U. S. 119, 129 (1977). Inmates clearly retain protections afforded by the First Amendment, *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974), including its directive that no law shall prohibit the free exercise of religion. See *Cruz* v. *Beto,* 405 U. S. 319 (1972) *(per curiam).* Second, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U. S. 266, 285 (1948). The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security. *Pell* v. *Procunier, supra,* at 822–823; *Procunier* v. *Martinez,* 416 U. S. 396, 412 (1974).

In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, "who are actually charged with and trained in the running of the particular institution under examination." *Bell* v. *Wolfish, supra,* at 562. See *Turner* v. *Safley, ante,* at 86–87. To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. See, *e. g., Jones* v. *North Carolina Prisoners' Labor Union, Inc., supra,* at 128. We recently restated the proper standard: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner* v. *Safley, ante,* at 89.[2] This approach ensures the ability of corrections officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," *ibid.,* and avoids unnecessary intrusion of the judiciary into problems particu-

[2] Our decision in *Turner* v. *Safley* rejected respondents' principal argument in this case—that more rigorous scrutiny is appropriate unless a court can conclude that the activity for which prisoners seek protection is "presumptively dangerous." See Brief for Respondents 30. See also *Abdul Wali* v. *Coughlin,* 754 F. 2d 1015, 1033 (CA2 1985). As we noted in *Turner, ante,* at 89, "[t]he determination that an activity is 'presumptively dangerous' appears simply to be a conclusion about the reasonableness of the prison restriction in light of the articulated security concerns. It therefore provides a tenuous basis for creating a hierarchy of standards of review."

Nor are we convinced that heightened scrutiny is appropriate whenever regulations effectively prohibit, rather than simply limit, a particular exercise of constitutional rights. See Brief for Respondents 30. As *Turner* makes clear, the presence or absence of alternative accommodations of prisoners' rights is properly considered a factor in the reasonableness analysis rather than a basis for heightened scrutiny. See *Turner, ante,* at 88, 90–91.

larly ill suited to "resolution by decree." *Procunier* v. *Martinez, supra,* at 405. See also *Turner* v. *Safley, ante,* at 89; *Bell* v. *Wolfish, supra,* at 548.

We think the Court of Appeals decision in this case was wrong when it established a separate burden on prison officials to prove "that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona fide security problems." 782 F. 2d, at 420. See also *id.,* at 419 (Prison officials should be required "to produce convincing evidence that they are unable to satisfy their institutional goals in any way that does not infringe inmates' free exercise rights"). Though the availability of accommodations is relevant to the reasonableness inquiry, we have rejected the notion that "prison officials . . . have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner* v. *Safley, ante,* at 90–91. By placing the burden on prison officials to disprove the availability of alternatives, the approach articulated by the Court of Appeals fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators.

Turning to consideration of the policies challenged in this case, we think the findings of the District Court establish clearly that prison officials have acted in a reasonable manner. *Turner* v. *Safley* drew upon our previous decisions to identify several factors relevant to this reasonableness determination. First, a regulation must have a logical connection to legitimate governmental interests invoked to justify it. *Ante,* at 89–90. The policies at issue here clearly meet that standard. The requirement that full minimum and gang minimum prisoners work outside the main facility was justified by concerns of institutional order and security, for the District Court found that it was "at least in part a response to a critical overcrowding in the state's prisons, and . . . at least in part designed to ease tension and drain on the facilities

during that part of the day when the inmates were outside the confines of the main buildings." 595 F. Supp., at 929. We think it beyond doubt that the standard is related to this legitimate concern.

The subsequent policy prohibiting returns to the institution during the day also passes muster under this standard. Prison officials testified that the returns from outside work details generated congestion and delays at the main gate, a high risk area in any event. Return requests also placed pressure on guards supervising outside details, who previously were required to "evaluate each reason possibly justifying a return to the facilities and either accept or reject that reason." *Id.*, at 931. Rehabilitative concerns further supported the policy; corrections officials sought a simulation of working conditions and responsibilities in society. Chief Deputy Ucci testified: "One of the things that society demands or expects is that when you have a job, you show up on time, you put in your eight hours, or whatever hours you are supposed to put in, and you don't get off . . . . If we can show inmates that they're supposed to show up for work and work a full day, then when they get out at least we've done something." Tr. 89. These legitimate goals were advanced by the prohibition on returns; it cannot seriously be maintained that "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner* v. *Safley, ante,* at 89–90.

Our decision in *Turner* also found it relevant that "alternative means of exercising the right . . . remain open to prison inmates." *Ante,* at 90. There are, of course, no alternative means of attending Jumu'ah; respondents' religious beliefs insist that it occur at a particular time. But the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service. While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison

officials are required by the Constitution to sacrifice legitimate penological objectives to that end. In *Turner,* we did not look to see whether prisoners had other means of communicating with fellow inmates, but instead examined whether the inmates were deprived of "all means of expression." *Ante,* at 92. Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies. The record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations. The right to congregate for prayer or discussion is "virtually unlimited except during working hours," Tr. 182 (testimony of O'Lone), and the state-provided imam has free access to the prison. Muslim prisoners are given different meals whenever pork is served in the prison cafeteria. Special arrangements are also made during the month-long observance of Ramadan, a period of fasting and prayer. During Ramadan, Muslim prisoners are awakened at 4 a.m. for an early breakfast, and receive dinner at 8:30 each evening. We think this ability on the part of respondents to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable.

Finally, the case for the validity of these regulations is strengthened by examination of the impact that accommodation of respondents' asserted right would have on other inmates, on prison personnel, and on allocation of prison resources generally. See *Turner* v. *Safley, ante,* at 90. Respondents suggest several accommodations of their practices, including placing all Muslim inmates in one or two inside work details or providing weekend labor for Muslim inmates. See Brief for Respondents 52–53. As noted by the District Court, however, each of respondents' suggested accommodations would, in the judgment of prison officials, have adverse effects on the institution. Inside work details for gang minimum inmates would be inconsistent with the legitimate con-

cerns underlying Standard 853, and the District Court found that the extra supervision necessary to establish weekend details for Muslim prisoners "would be a drain on scarce human resources" at the prison.  595 F. Supp., at 932.  Prison officials determined that the alternatives would also threaten prison security by allowing "affinity groups" in the prison to flourish.  Administrator O'Lone testified that "we have found out and think almost every prison administrator knows that any time you put a group of individuals together with one particular affinity interest . . . you wind up with . . . a leadership role and an organizational structure that will almost invariably challenge the institutional authority."  Tr. 179–180.  Finally, the officials determined that special arrangements for one group would create problems as "other inmates [see] that a certain segment is escaping a rigorous work detail" and perceive favoritism.  *Id.*, at 178–179. These concerns of prison administrators provide adequate support for the conclusion that accommodations of respondents' request to attend Jumu'ah would have undesirable results in the institution.  These difficulties also make clear that there are no "obvious, easy alternatives to the policy adopted by petitioners."  *Turner* v. *Safley, ante,* at 93.

We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to "substitute our judgment on . . . difficult and sensitive matters of institutional administration," *Block* v. *Rutherford,* 468 U. S. 576, 588 (1984), for the determinations of those charged with the formidable task of running a prison.  Here the District Court decided that the regulations alleged to infringe constitutional rights were reasonably related to legitimate penological objectives.  We agree with the District Court, and it necessarily follows that the regulations in question do not offend the Free Exercise Clause of the First Amendment to the United States Constitution.  The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

The religious ceremony that these respondents seek to attend is not presumptively dangerous, and the prison has completely foreclosed respondents' participation in it. I therefore would require prison officials to demonstrate that the restrictions they have imposed are necessary to further an important government interest, and that these restrictions are no greater than necessary to achieve prison objectives. See *Turner* v. *Safley, ante,* at 101, n. 1 (STEVENS, J., concurring in part and dissenting in part) (citing *Abdul Wali* v. *Coughlin,* 754 F. 2d 1015 (CA2 1985)). As a result, I would affirm the Court of Appeals' order to remand the case to the District Court, and would require prison officials to make this showing. Even were I to accept the Court's standard of review, however, I would remand the case to the District Court, since that court has not had the opportunity to review respondents' claim under the new standard established by this Court in *Turner.* As the record now stands, the reasonableness of foreclosing respondents' participation in Jumu'ah has not been established.

## I

Prisoners are persons whom most of us would rather not think about. Banished from everyday sight, they exist in a shadow world that only dimly enters our awareness. They are members of a "total institution"[1] that controls their daily existence in a way that few of us can imagine:

> "[P]rison is a complex of physical arrangements and of measures, all wholly governmental, all wholly performed by agents of government, which determine the total existence of certain human beings (except perhaps in the realm of the spirit, and inevitably there as well) from sundown to sundown, sleeping, waking, speaking, silent,

---

[1] See E. Goffman, Asylums: Essays on the Social Situation of Mental Patients and Other Inmates 1–125 (1961)

working, playing, viewing, eating, voiding, reading, alone, with others. It is not so, with members of the general adult population. State governments have not undertaken to require members of the general adult population to rise at a certain hour, retire at a certain hour, eat at certain hours, live for periods with no companionship whatever, wear certain clothing, or submit to oral and anal searches after visiting hours, nor have state governments undertaken to prohibit members of the general adult population from speaking to one another, wearing beards, embracing their spouses, or corresponding with their lovers." *Morales* v. *Schmidt*, 340 F. Supp. 544, 550 (WD Wis. 1972).

It is thus easy to think of prisoners as members of a separate netherworld, driven by its own demands, ordered by its own customs, ruled by those whose claim to power rests on raw necessity. Nothing can change the fact, however, that the society that these prisoners inhabit is our own. Prisons may exist on the margins of that society, but no act of will can sever them from the body politic. When prisoners emerge from the shadows to press a constitutional claim, they invoke no alien set of principles drawn from a distant culture. Rather, they speak the language of the charter upon which all of us rely to hold official power accountable. They ask us to acknowledge that power exercised in the shadows must be restrained at least as diligently as power that acts in the sunlight.

In reviewing a prisoner's claim of the infringement of a constitutional right, we must therefore begin from the premise that, as members of this society, prisoners retain constitutional rights that limit the exercise of official authority against them. See *Bell* v. *Wolfish*, 441 U. S. 520, 545 (1979). At the same time, we must acknowledge that incarceration by its nature changes an individual's status in society. Prison officials have the difficult and often thankless job of preserving security in a potentially explosive setting,

as well as of attempting to provide rehabilitation that prepares some inmates for re-entry into the social mainstream. Both these demands require the curtailment and elimination of certain rights.

The challenge for this Court is to determine how best to protect those prisoners' rights that remain. Our objective in selecting a standard of review is therefore *not*, as the Court declares, "[t]o ensure that courts afford appropriate deference to prison officials." *Ante*, at 349. The Constitution was not adopted as a means of enhancing the efficiency with which government officials conduct their affairs, nor as a blueprint for ensuring sufficient reliance on administrative expertise. Rather, it was meant to provide a bulwark against infringements that might otherwise be justified as necessary expedients of governing. The practice of Europe, wrote James Madison, was "charters of liberty . . . granted by power"; of America, "charters of power granted by liberty." 6 Writings of James Madison 83 (G. Hunt ed. 1906). While we must give due consideration to the needs of those in power, this Court's role is to ensure that fundamental *restraints* on that power are enforced.

In my view, adoption of "reasonableness" as a standard of review for *all* constitutional challenges by inmates is inadequate to this task. Such a standard is categorically deferential, and does not discriminate among degrees of deprivation. From this perspective, restricting use of the prison library to certain hours warrants the same level of scrutiny as preventing inmates from reading at all. Various "factors" may be weighed differently in each situation, but the message to prison officials is clear: merely act "reasonably" and your actions will be upheld. If a directive that officials act "reasonably" were deemed sufficient to check all exercises of power, the Constitution would hardly be necessary. Yet the Court deems this single standard adequate to restrain *any* type of conduct in which prison officials might engage.

It is true that the degree of deprivation is one of the factors in the Court's reasonableness determination. This by itself does not make the standard of review appropriate, however. If it did, we would need but a single standard for evaluating all constitutional claims, as long as every relevant factor were considered under its rubric. Clearly, we have never followed such an approach. A standard of review frames the terms in which justification may be offered, and thus delineates the boundaries within which argument may take place.[2] The use of differing levels of scrutiny proclaims that on some occasions official power must justify itself in a way that otherwise it need not. A relatively strict standard of review is a signal that a decree prohibiting a political demonstration on the basis of the participants' political beliefs is of more serious concern, and therefore will be scrutinized more closely, than a rule limiting the number of demonstrations that may take place downtown at noon.

Thus, even if the absolute nature of the deprivation may be taken into account in the Court's formulation, it makes a difference that this is merely one factor in determining if official conduct is "reasonable." Once we provide such an elastic and deferential principle of justification, "[t]he principle . . . lies about like a loaded weapon ready for the hand of any authority that can bring forth a plausible claim of an urgent need. Every repetition imbeds that principle more deeply in our law and thinking and expands it to new purposes." *Korematsu* v. *United States*, 323 U. S. 214, 246 (1944) (Jackson, J.,

---

[2] As one scholar has commented:

"The language that the lawyer uses and remakes is a language of meaning in the fullest sense. It is a language in which our perceptions of the natural universe are constructed and related, in which our values and motives are defined, in which our methods of reasoning are elaborated and enacted; and it gives us our terms for constructing a social universe by defining roles and actors and by establishing expectations as to the propriety of speech and conduct." J. B. White, Rhetoric and Law: The Arts of Cultural and Communal Life, in Heracles' Bow: Essays on the Rhetoric and Poetics of the Law 36 (1985).

dissenting).   Mere assertions of exigency have a way of providing a colorable defense for governmental deprivation, and we should be especially wary of expansive delegations of power to those who wield it on the margins of society.   Prisons are too often shielded from public view; there is no need to make them virtually invisible.

An approach better suited to the sensitive task of protecting the constitutional rights of inmates is laid out by Judge Kaufman in *Abdul Wali* v. *Coughlin*, 754 F. 2d 1015 (CA2 1985).   That approach maintains that the degree of scrutiny of prison regulations should depend on "the nature of the right being asserted by prisoners, the type of activity in which they seek to engage, and whether the challenged restriction works a total deprivation (as opposed to a mere limitation) on the exercise of that right." *Id.*, at 1033.   Essentially, if the activity in which inmates seek to engage is presumptively dangerous, or if a regulation merely restricts the time, place, or manner in which prisoners may exercise a right, a prison regulation will be invalidated only if there is no reasonable justification for official action. *Ibid.*   Where exercise of the asserted right is not presumptively dangerous, however, and where the prison has completely deprived an inmate of that right, then prison officials must show that "a particular restriction is necessary to further an important governmental interest, and that the limitations on freedoms occasioned by the restrictions are no greater than necessary to effectuate the governmental objective involved." *Ibid.*

The court's analytical framework in *Abdul Wali* recognizes that in many instances it is inappropriate for courts "to substitute our judgments for those of trained professionals with years of firsthand experience." *Ibid.*   It would thus apply a standard of review identical to the Court's "reasonableness" standard in a significant percentage of cases.   At the same time, the *Abdul Wali* approach takes seriously the Constitution's function of requiring that official power be called to account when it completely deprives a person of a right that

society regards as basic. In this limited number of cases, it would require more than a demonstration of "reasonableness" to justify such infringement. To the extent that prison is meant to inculcate a respect for social and legal norms, a requirement that prison officials persuasively demonstrate the need for the absolute deprivation of inmate rights is consistent with that end. Furthermore, prison officials are in control of the evidence that is essential to establish the superiority of such deprivation over other alternatives. It is thus only fair for these officials to be held to a stringent standard of review in such extreme cases.

The prison in this case has completely prevented respondent inmates from attending the central religious service of their Muslim faith. I would therefore hold prison officials to the standard articulated in *Abdul Wali,* and would find their proffered justifications wanting. The State has neither demonstrated that the restriction is necessary to further an important objective nor proved that less extreme measures may not serve its purpose. Even if I accepted the Court's standard of review, however, I could not conclude on this record that prison officials have proved that it is reasonable to preclude respondents from attending Jumu'ah. Petitioners have provided mere unsubstantiated assertions that the plausible alternatives proposed by respondents are infeasible.

## II

In *Turner,* the Court set forth a framework for reviewing allegations that a constitutional right has been infringed by prison officials. The Court found relevant to that review "whether there are alternative means of exercising the right that remain open to prison inmates." *Ante,* at 90. The Court in this case acknowledges that "respondents' sincerely held religious beliefs compe[l] attendance at Jumu'ah," *ante,* at 345, and concedes that there are "no alternative means of attending Jumu'ah." *Ante,* at 351. Nonetheless, the Court finds that prison policy does not work a complete

deprivation of respondents' asserted religious right, because respondents have the opportunity to participate in other religious activities. *Ante,* at 352. This analysis ignores the fact that, as the District Court found, Jumu'ah is the central religious ceremony of Muslims, "comparable to the Saturday service of the Jewish faith and the Sunday service of the various Christian sects." *Shabazz* v. *O'Lone,* 595 F. Supp. 928, 930 (NJ 1984). As with other faiths, this ceremony provides a special time in which Muslims "assert their identity as a community covenanted to God." Brief for Imam Jamil Abdullah Al-Amin et al. as *Amici Curiae* 32. As a result:

> "unlike other Muslim prayers which are performed individually and can be made up if missed, the Jumu'ah is obligatory, cannot be made up, and must be performed in congregation. The Jumu'ah is therefore regarded as the central service of the Muslim religion, and the obligation to attend is commanded by the Qur'an, the central book of the Muslim religion." 595 F. Supp., at 930.

Jumu'ah therefore cannot be regarded as one of several essentially fungible religious practices. The ability to engage in other religious activities cannot obscure the fact that the denial at issue in this case is absolute: respondents are completely foreclosed from participating in the core ceremony that reflects their membership in a particular religious community. If a Catholic prisoner were prevented from attending Mass on Sunday, few would regard that deprivation as anything but absolute, even if the prisoner were afforded other opportunities to pray, to discuss the Catholic faith with others, and even to avoid eating meat on Friday if that were a preference. Prison officials in this case therefore cannot show that "'other avenues' remain available for the exercise of the asserted right." *Turner, ante,* at 90 (quoting *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119, 131 (1977)).

Under the Court's approach, as enunciated in *Turner,* the availability of other means of exercising the right in question

counsels considerable deference to prison officials. *Ante*, at 90. By the same token, the infliction of an absolute deprivation should require more than mere assertion that such a deprivation is necessary. In particular, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Ibid.* In this case, petitioners have not established the reasonableness of their policy, because they have provided only bare assertions that the proposals for accommodation offered by respondents are infeasible. As discussed below, the federal policy of permitting inmates in federal prisons to participate in Jumu'ah, as well as Leesburg's own policy of permitting participation for several years, lends plausibility to respondents' suggestion that their religious practice can be accommodated.

In *Turner*, the Court found that the practices of the Federal Bureau of Prisons were relevant to the availability of reasonable alternatives to the policy under challenge.[3] In upholding a ban on inmate-to-inmate mail, the Court noted that the Bureau had adopted "substantially similar restrictions." *Ante*, at 93 (citing 28 CFR § 540.17 (1986)). In finding that there were alternatives to a stringent restriction on the ability to marry, the Court observed that marriages by inmates in federal prisons were generally permitted absent a threat to security or public safety. See *ante*, at 97 (citing 28 CFR § 551.10 (1986)). In the present case, it is therefore worth noting that Federal Bureau of Prisons regulations require the adjustment of work assignments to permit inmate participation in religious ceremonies, absent a threat to "security, safety, and good order." 28 CFR § 548.14 (1986). The Bureau's Directive implementing the regulations on Religious Beliefs and Practices of Committed Offend-

---

[3] See also *Procunier* v. *Martinez*, 416 U. S. 396, 414, n. 14 (1974) ("While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction").

ers, 28 CFR §§ 548.10–548.15 (1986), states that, with respect to scheduling religious observances, "[t]he more central the religious activity is to the tenets of the inmate's religious faith, the greater the presumption is for relieving the inmate from the institution program or assignment." App. to Brief for Respondents 8a. Furthermore, the Chaplain Director of the Bureau has spoken directly to the issue of participation of Muslim inmates in Jumu'ah:

> "Provision is made, by policy, in all Bureau facilities for the observance of Jumu-ah by all inmates in general population who wish to keep this faith practice. The service is held each Friday afternoon in the general time frame that corresponds to the requirements of Islamic jurisprudence. . . .
>
> "Subject only to restraints of security and good order in the institution all routine and normal work assignments are suspended for the Islamic inmates to ensure freedom to attend such services. . . .
>
> "In those institutions where the outside work details contain Islamic inmates, they are permitted access to the inside of the institution to attend the Jumu-ah." *Id.*, at 1a.

That Muslim inmates are able to participate in Jumu'ah throughout the entire federal prison system suggests that the practice is, under normal circumstances, compatible with the demands of prison administration.[4] Indeed, the Leesburg State Prison permitted participation in this ceremony for five years, and experienced no threats to security or safety as a result. In light of both standard federal prison practice and Leesburg's own past practice, a reasonableness test in this

---

[4] See also American Correctional Association, Manual of Correctional Standards xxi (3d ed. 1966) ("Religion represents a rich resource in the moral and spiritual regeneration of mankind. Especially trained chaplains, religious instruction and counseling, together with adequate facilities for group worship of the inmate's own choice, are essential elements in the program of a correctional institution").

case demands at least minimal substantiation by prison officials that alternatives that would permit participation in Jumu'ah are infeasible.[5] Under the standard articulated by the Court in *Turner*, this does not mean that petitioners are responsible for identifying and discrediting these alternatives; "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Ante*, at 90–91. When prisoners themselves present alternatives, however, and when they fairly call into question official claims that these alternatives are infeasible, we must demand at least some evidence beyond mere assertion that the religious practice at issue cannot be accommodated. Examination of the alternatives proposed in this case indicates that prison officials have not provided such substantiation.

## III

Respondents' first proposal is that gang minimum prisoners be assigned to an alternative inside work detail on Friday, as they had been before the recent change in policy. Prison officials testified that the alternative work detail is now restricted to maximum security prisoners, and that they did not wish maximum and minimum security prisoners to

---

[5] This is particularly true in light of the fact that Black Muslims in prisons in this country have not always been provided the same opportunities to practice their religion as members of other denominations. As the American Bar Association Section of Criminal Justice has observed:

"The real problem comes not with facilities *for* religious service, but with attempts of prison officials to *prevent* or restrict certain religious movements within the prison. Chief among these movements has been the Black Muslims, whose lawsuits to compel recognition of their religion were the opening volley in prison litigation. *See, e. g., Sostre* v. *McGinnis*, 334 F. 2d 906 (2d Cir. 1964); *Pierce* v. *LaVallee*, 293 F. 2d 233 (2d Cir. 1961), *on remand*, 212 F. Supp. 865 (N. D. N. Y. 1962), *aff'd per curiam*, 319 F. 2d 844 (2d Cir. 1963); *Bryant* v. *Wilkins*, 258 N. Y. S. 2d 455, 45 Misc. 2d 923 (Sup. Ct. 1965)." ABA Committee on the Legal Status of Prisoners, Legal Status of Prisoners (Tent. Draft 1977), 14 Am. Crim. L. Rev. 377, 508 (1977).

mingle. Even the District Court had difficulty with this assertion, as it commented that "[t]he defendants did not explain why inmates of different security levels are not mixed on work assignments when otherwise they are mixed." 595 F. Supp., at 932. The court found, nonetheless, that this alternative would be inconsistent with Standard 853's mandate to move gang minimum inmates to outside work details. *Ibid.* This conclusion, however, neglects the fact that the very issue is whether the prison's policy, of which Standard 853 is a part, should be administered so as to accommodate Muslim inmates. The policy itself cannot serve as a justification for its failure to provide reasonable accommodation. The record as it now stands thus does not establish that the Friday alternative work detail would create a problem for the institution.

Respondents' second proposal is that gang minimum inmates be assigned to work details inside the main building on a regular basis. While admitting that the prison used inside details in the kitchen, bakery, and tailor shop, officials stated that these jobs are reserved for the riskiest gang minimum inmates, for whom an outside job might be unwise. *Ibid.* Thus, concluded officials, it would be a bad idea to move these inmates outside to make room for Muslim gang minimum inmates. Respondents contend, however, that the prison's own records indicate that there are a significant number of jobs inside the institution that could be performed by inmates posing a lesser security risk. This suggests that it might not be necessary for the riskier gang minimum inmates to be moved outside to make room for the less risky inmates. Officials provided no data on the number of inside jobs available, the number of high-risk gang minimum inmates performing them, the number of Muslim inmates that might seek inside positions, or the number of staff that would be necessary to monitor such an arrangement. Given the plausibility of respondents' claim, prison officials should present at least

this information in substantiating their contention that inside assignments are infeasible.

Third, respondents suggested that gang minimum inmates be assigned to Saturday or Sunday work details, which would allow them to make up any time lost by attending Jumu'ah on Friday. While prison officials admitted the existence of weekend work details, they stated that "[s]ince prison personnel are needed for other programs on weekends, the creation of additional weekend details would be a drain on scarce human resources." *Ibid.* The record provides no indication, however, of the number of Muslims that would seek such a work detail, the current number of weekend details, or why it would be infeasible simply to reassign current Saturday or Sunday workers to Friday, rather than create additional details. The prison is able to arrange work schedules so that Jewish inmates may attend services on Saturday and Christian inmates may attend services on Sunday. *Id.*, at 935. Despite the fact that virtually all inmates are housed in the main building over the weekend, so that the demand on the facility is greater than at any other time, the prison is able to provide sufficient staff coverage to permit Jewish and Christian inmates to participate in their central religious ceremonies. Given the prison's duty to provide Muslims a "reasonable opportunity of pursuing [their] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts," *Cruz* v. *Beto*, 405 U. S. 319, 322 (1972), prison officials should be required to provide more than mere assertions of the infeasibility of weekend details for Muslim inmates.

Finally, respondents proposed that minimum security inmates living at the Farm be assigned to jobs either in the Farm building or in its immediate vicinity. Since Standard 853 permits such assignments for full minimum inmates, and since such inmates need not return to prison facilities through the main entrance, this would interfere neither with Standard 853 nor the concern underlying the no-return pol-

icy.[6] Nonetheless, prison officials stated that such an arrangement might create an "affinity group" of Muslims representing a threat to prison authority. Officials pointed to no such problem in the five years in which Muslim inmates were permitted to assemble for Jumu'ah, and in which the alternative Friday work detail was in existence. Nor could they identify any threat resulting from the fact that during the month of Ramadan all Muslim prisoners participate in both breakfast and dinner at special times.[7] Furthermore, there was no testimony that the concentration of Jewish or Christian inmates on work details or in religious services posed any type of "affinity group" threat. As the record now stands, prison officials have declared that a security risk is created by a grouping of Muslim inmates in the least dangerous security classification, but not by a grouping of maximum security inmates who are concentrated in a work detail inside the main building, and who are the only Muslims assured of participating in Jumu'ah. Surely, prison officials should be required to provide at least some substantiation for this facially implausible contention.

Petitioners also maintained that the assignment of full minimum Muslim inmates to the Farm or its near vicinity might provoke resentment because of other inmates' perception that Muslims were receiving special treatment. Officials pointed to no such perception during the period in which the alternative Friday detail was in existence, nor to any resentment of the fact that Muslims' dietary preferences are accommodated and that Muslims are permitted to operate on a special schedule during the month of Ramadan. Nor do they identify any such problems created by the accommodation of

---

[6] The Chief Deputy testified that there was no congestion problem with respect to the entrance to the full minimum security Farm building. Tr. 119.

[7] Indeed, the Chief Deputy testified that full minimum Muslim inmates presented no greater threat to security or discipline than non-Muslim inmates. *Id.*, at 138–139.

the religious preferences of inmates of other faiths. Once again, prison officials should be required at a minimum to identify the basis for their assertions.

Despite the plausibility of the alternatives proposed by respondents in light of federal practice and the prison's own past practice, officials have essentially provided mere pronouncements that such alternatives are not workable. If this Court is to take seriously its commitment to the principle that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner, ante,* at 84, it must demand more than this record provides to justify a Muslim inmate's complete foreclosure from participation in the central religious service of the Muslim faith.

## IV

That the record in this case contains little more than assertions is not surprising in light of the fact that the District Court proceeded on the basis of the approach set forth in *St. Claire* v. *Cuyler,* 634 F. 2d 109 (CA3 1980). That case held that mere "sincer[e]" and "arguably correct" testimony by prison officials is sufficient to demonstrate the need to limit prisoners' exercise of constitutional rights. *Id.,* at 114 (quoting *Jones,* 433 U. S., at 127). This Court in *Turner, ante,* p. 78, however, set forth a more systematic framework for analyzing challenges to prison regulations. *Turner* directed attention to two factors of particular relevance to this case: the degree of constitutional deprivation and the availability of reasonable alternatives. The respondents in this case have been absolutely foreclosed from participating in the central religious ceremony of their Muslim faith. At least a colorable claim that such a drastic policy is not necessary can be made in light of the ability of federal prisons to accommodate Muslim inmates, Leesburg's own past practice of doing so, and the plausibility of the alternatives proposed by respondents. If the Court's standard of review is to represent anything more than reflexive deference to prison officials, any

finding of reasonableness must rest on firmer ground than the record now presents.

Incarceration by its nature denies a prisoner participation in the larger human community. To deny the opportunity to affirm membership in a spiritual community, however, may extinguish an inmate's last source of hope for dignity and redemption.[8] Such a denial requires more justification than mere assertion that any other course of action is infeasible. While I would prefer that this case be analyzed under the approach set out in Part I, *supra*, I would at a minimum remand to the District Court for an analysis of respondents' claims in accordance with the standard enunciated by the Court in *Turner* and in this case. I therefore dissent.

---

[8] As one federal court has stated:

"Treatment that degrades the inmate, invades his privacy, and frustrates the ability to choose pursuits through which he can manifest himself and gain self-respect erodes the very foundations upon which he can prepare for a socially useful life. Religion in prison subserve - the rehabilitative function by providing an area within which the inmate may reclaim his dignity and reassert his individuality." *Barnett* v. *Rodgers*, 133 U. S. App. D. C. 296, 303, 410 F. 2d 995, 1002 (1969) (footnotes omitted).

See also Comment, Religious Rights of the Incarcerated, 125 U. Pa. L. Rev. 812, 853–854 (1977) ("An inmate's conscience is no less inviolable than that of an unconfined citizen, and a violation could well work an even greater harm upon the inmate, whose means of spiritual recovery are limited by the prison environment"). On the important role of religious commitment in penological rehabilitation, see generally Batson, Sociobiology and the Role of Religion in Promoting Prosocial Behavior: An Alternative View, 45 J. of Personality and Social Psychology 1380 (1983); Heintzelman & Fehr, Relationship Between Religious Orthodoxy and Three Personality Variables, 38 Psych. Reports 756 (1976).