**Macarthur DENSON, Plaintiff,**

v.

**John MARSHALL, Jr. and Mark Powers, Defendants.**

**No. CIV. A. 98–11156–WGY.**

United States District Court, D. Massachusetts.

July 12, 1999.

MacArthur Denson, South Walpole, MA, Pro se.

Ann M. McCarthy, Boston, MA, for John H. Marshall, Jr., Mark Powers, Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

### I. *Introduction*

The plaintiff, Macarthur Denson ("Denson"), a practicing Muslim, is a state prison inmate housed at the Cedar Junction Massachusetts Correctional Institution in Walpole ("Cedar Junction"). Denson, brings this civil rights action against Cedar Junction Superintendent John Marshall, Jr. ("Marshall") and Cedar Junction Deputy Superintendent Mark Powers ("Powers") for violation of the Free Exercise Clause of the United States Constitution

and the Massachusetts Declaration of Rights.

## II. *Background*

Denson is serving a ten year disciplinary sentence in the Department Disciplinary Unit ("the Unit") at Cedar Junction for raping a female therapist at the Massachusetts Treatment Center on July 10, 1997. At the time of the attack, Denson was serving a prison term for a previous conviction of aggravated rape.

The Unit consists of inmates found guilty of serious and repetitive disciplinary offenses while in prison. *See* Marshall Aff. of Oct. 28, 1998 ("Marshall Aff. I") at ¶ 3. The Unit houses "the most violent, assaultive and disruptive inmates in the Commonwealth." *Id.* Inmates are sentenced to the Unit as a punitive measure in order to deter their own and other inmates' serious misconduct in the Commonwealth's prisons. *See id.* Consequently, the Unit is a restrictive environment. *See id.* While prisoners can earn certain privileges for good behavior such as telephone calls, social visits, and television, they do not have canteen privileges, except to buy postage stamps. *See id.* at ¶¶ 3, 4.

On April 23, 1998, Denson sent a letter to Marshall seeking special food arrangements in order to observe three religious fast days per month. *See* Pl. Mem., Ex. A. These fasts typically occur in the middle of the month and require observers to abstain from food and drink between sunrise and sunset. *See* Rahim Aff. at ¶ 6. Because Denson cannot purchase food at the canteen, he asked Marshall to replace his regular meals on fast days with the caloric equivalent of cereal, milk, bread, peanut butter and jelly that he can eat before and after daylight hours. *See* Pl. Mem., Ex. A. On May 19, 1998, Powers informed Denson that his request had been denied. *See id.* at Ex. B. Denson filed suit on June 6, 1998.

Both parties moved for summary judgment. In a Memorandum and Order, this Court (1) granted Marshall and Powers' motion on Denson's Religious Freedom Restoration Act claim and denied their motion on Denson's remaining claims, (2) ordered Marshall and Powers to comply with Denson's request or submit supplemental summary judgment materials within sixty days, and (3) declined to rule on Denson's motion pending further submissions by Marshall and Powers. *See Denson v. Marshall,* 44 F.Supp.2d 400, 403 (D.Mass.1999). Marshall and Powers submitted a supplemental motion for summary judgment on May 28, 1999, to which Denson responded with his own motion for summary judgment. These motions are presently before the Court.

## III. *Summary Judgment Standard*

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

## IV. *Discussion*

█ Prisoners do not forfeit all constitutional protections simply by virtue of their incarceration. *See Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The Supreme Court has specifically held that inmates retain First Amendment protections, *see Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), including the free exercise of religion, *see Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam).[1]

---

1. The Massachusetts Declaration of Rights, which offers parallel protection from government interference with the free exercise of religion, also applies to prisoners. *See Rash-* *eed v. Dubois,* No. 96–4599, slip op. at 3 (Mass.Sup.Ct. Nov. 17, 1998) (Lopez, J.) (holding that prison officials could not pre-

■ Prisoners, however, do not enjoy the same level of constitutional protections as do ordinary citizens. *See, e.g., Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."). Consequently, courts scrutinize allegedly unconstitutional prison regulations under a "reasonableness" standard less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). A prison regulation is valid so long as "it is necessarily related to legitimate penological interests." *Id.*

■ In determining whether a prison regulation passes constitutional muster, courts give great deference to the "considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *Id.* (quoting *Bell,* 441 U.S. at 562, 99 S.Ct. 1861). Two separate policies underlying our system of government justify such deference. First, because prison administration falls within the province of the legislative and executive branches, separation of powers concerns counsel judicial restraint. *See Turner v. Safley,* 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Second, when an inmate allegedly suffers constitutional harm in a state prison, comity between state and federal regimes provides an additional reason for federal courts to defer to prison officials. *See id.*

■ Taking the judgment of prison administrators into account, a court must consider three factors in order to determine whether a particular prison regulation violates an inmate's constitutional rights. First, there must be a valid, rational connection between the regulation and the legitimate governmental interest set forth to justify it. *See id.* at 89, 107 S.Ct. 2254. Second, the court must consider whether the inmate retains alternative means through which to exercise the right. *See id.* at 90, 107 S.Ct. 2254. Finally, the court must examine the impact of the requested accommodation on prison guards, other inmates, and the allocation of prison resources. *See id.*

A. *Legitimate Government Interest*

■ According to Marshall, the prison cannot accommodate Denson's request for several reasons. First, "the delivery of food to inmates before sunrise represents a significant disruption to the normal operation of the kitchen operation and to the operation of the 11–7 security shift." Marshall Aff. of May 7, 1999 ("Marshall Aff. II") at ¶ 3. Second, "[p]roviding ... one inmate with a different feeding routine each month would be unreasonably disruptive to the operation of the ... Unit" because "[i]t is important that all inmates be treated as uniformly as possible ...." *Id.* at ¶ 7. Third, "the institution does not ordinarily purchase items like peanut butter and jelly," and thus providing these foods to one prisoner "would create both a storage problem and a spoilage problem since items are generally purchased in bulk."[2] *Id.* at ¶ 8. Finally, since "inmates react negatively when they perceive that another inmate is receiving extra or special privileges," *id.* at ¶ 9, "there would be a flood of new individual requests from inmates, or worse, that they might act out against inmate Denson," *id.*

Marshall and Powers have a legitimate interest in operating an efficient and cost-effective food program. *See Collins v. Rhode Island Dep't of Corrections,* C.A.

clude a prisoner at Cedar Junction from wearing an Islamic pendent around his neck).

2. Although Marshall and Powers have carried their burden of presenting legitimate govern-

ment interests, the Court pauses to note that unopened jars of peanut butter and jelly do not present particularly acute "spoilage" problems, even when purchased in bulk.

No. 92–0155L, 1994 WL 115968, at *4 (D.R.I. Mar. 10, 1994) (holding that prison's refusal to supply Muslim inmate with peanut butter and jelly as a protein supplement did not violate Free Exercise Clause). They are also appropriately concerned with prison security, see O'Lone, 482 U.S. at 350, 107 S.Ct. 2400, and the potential for disruption among other prisoners, see Collins, 1994 WL 115968, at *4.

The denial of Denson's request for special food to be delivered at a special time is reasonably related to furthering these legitimate penological interests. See O'Lone, 482 U.S. at 350–51, 107 S.Ct. 2400 (prison regulation preventing attendance at weekly religious service not unconstitutional because of government's interest in security, overcrowding, and rehabilitation). Accordingly, this Court concludes that there is a valid, rational connection between the denial of Denson's request and the legitimate governmental interests set forth to justify it. See Turner, 482 U.S. at 89, 107 S.Ct. 2254.

### B. Alternative Means

Cedar Junction provides Muslim inmates with several means through which to celebrate and observe their faith. The prison facilitates the month-long Ramadan celebration by providing inmates with non-perishable foods before sunrise and by monitoring compliance with the fast requirement. See Marshall Aff. II at ¶ 3. The prison does not serve pork to any prisoners. See id. at ¶ 4. In addition, Cedar Junction provides Muslim prisoners with a religious book, religious beads, access to religious leaders, and the ability to pray five times per day. See id. at ¶ 10.

In O'Lone, 482 U.S. at 352, 107 S.Ct. 2400, the Supreme Court held that a prison regulation preventing a weekly religious service did not offend the First Amendment when prisoners were able to pray, receive pork-free meals, and observe Ramadan. Similarly, Cedar Junction provides its Muslim prisoners with adequate means to practice their religion, even if they cannot receive special food arrangements for monthly three-day fasts.

### C. Impact of Requested Accommodation

As Marshall stated in his affidavit, Denson's requested accommodation would create logistical and economic problems for the food services division, disrupt the Unit by singling out Denson for special treatment, increase the number of individual requests made by prisoners, and possibly compromise Denson's safety. See Marshall Aff. II at ¶¶ 3, 7–9. In O'Lone, 482 U.S. at 353, 107 S.Ct. 2400, the Supreme Court held that a prison did not have to accommodate a religious request when such accommodation would threaten security and cause other inmates to perceive favoritism.

"When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Turner, 482 U.S. at 90, 107 S.Ct. 2254. Thus, the Court relies on Marshall's informed opinion that "the present policies [regarding religious practice] . . . are the least restrictive and most cost effective way to allow the plaintiff and other Muslim inmates in the [Unit] to practice their religion while still providing for the internal order and safety and maintaining the purpose of the [Unit], i.e., punishment and deterrence." Marshall Aff. II at ¶ 10.

### V. Conclusion

For the foregoing reasons, this Court holds that Cedar Junction need not comply with Denson's request for special food provisions so that he may observe monthly three-day fasts. Accordingly, the Court hereby GRANTS Marshall and Powers' motion for summary judgment and DENIES Denson's motion for summary judgment.