Thomas BENJAMIN, Errol Dunkley, Frank Forrest, Barrington Gray, Newton Hannon, and Martin Spence, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Thomas A. COUGHLIN, Commissioner, New York State Department of Correctional Services; Stephen Dalshiem, Superintendent, Ossining Correctional Facility; Eugene S. Lefevre, Superintendent, Clinton Correctional Facility; Harold Smith, Superintendent, Attica Correctional Facility, Defendants.

No. 79 Civ. 0232(LLS).

United States District Court, S.D. New York.

March 13, 1989.

Prisoners' Legal Services of New York, Poughkeepsie, N.Y., for plaintiffs; Robert Selcor, Stephen Latimer, of counsel.

Robert Abrams, Atty. Gen., of the State of New York, Albany, for defendants; Tarquin Jay Bromley, of counsel.

## OPINION AND ORDER

STANTON, District Judge.

Plaintiffs are Rastafarian inmates in the custody of the New York State Department of Correctional Services ("DOCS").

Rastafari is a religion[1] with roots in Jamaican culture. It has no hierarchy of religious authority, although Rastafarians recognize some who have studied the religion extensively as "elders," and no single religious text setting out the central tenets of Rastafarian belief, although Rastafarians consider certain Bible passages sacred. There are several Rastafarian sects, with differing beliefs and practices.

The most widely accepted Rastafarian principles include beliefs in the divinity of Ethiopian Emperor Haile Selassie and that the hair and beard should never be cut. Many Rastafarians wear their hair uncut, uncombed, and called "dreadlocks." Many believe that the dreadlocks should be covered at all times, except when praying, and wear a religious "crown"—a loose knit or crocheted headcovering—to protect their dreadlocks. Rastafarians engage in dialogues about the meaning of scripture, known as "reasoning," and conduct weekly group services that last from a few hours to several days. They also hold religious celebrations on Haile Selassie's birthday and on the anniversary of his coronation. The green, red, and gold colors of the Ethiopian flag and the lion, which symbolizes Haile Selassie, are sacred symbols. Many Rastafarians follow what is known as an "Ital" diet, abstaining from meat, liquor, and caffeine, and eating only natural foods, although there are variations in these practices.

Plaintiffs claim that four regulations of the defendants, who administer prison facilities in New York State, violate their rights to free exercise of religion and equal protection of the laws. First, defendants cut the hair of all incoming prisoners for the purpose of taking identification pictures. Second, defendants restrict the wearing of the religious "crown." Third, defendants do not provide Rastafarian inmates with an Ital diet. Fourth, defendants do not allow Rastafarian inmates to hold weekly congregate religious services or holiday celebrations. Defendants claim that each of their actions is motivated by a legitimate penological objective.

### Procedural History

The action was commenced on January 15, 1979. It was dormant from April 1980 to March 1985, while settlement was discussed unsuccessfully. In May 1986, the parties stipulated to certification of a plaintiff class consisting of all "persons who are or who shall be committed to the care and custody of the New York State Department of Correctional Services and confined in facilities under its jurisdiction and control, who sincerely profess to observe and adhere to the tenets of Rastafarianism." On August 29, 1986 the court granted plaintiffs' motion for a preliminary injunction prohibiting DOCS from cutting the hair of class members. *Benjamin v. Coughlin*, 643 F.Supp. 351 (S.D.N.Y.1986). On June 30, 1987, defendants filed a motion to vacate the preliminary injunction. The motion has been consolidated with the trial of the merits of plaintiffs' claims.

A bench trial was held on August 31, September 1, 2 and 3, 1987. The court heard testimony from eight inmate class members (Jah Bunny, Ernest Desire, David Daley, Edward Jamison, Ernest Nurse, Wayne Overton, Alfredo Lewis and Marlon Clarke), plaintiffs' expert nutritionist Bob LeRoy, defendants Thomas Coughlin (Superintendent of DOCS) and Philip Coombe (Deputy Commissioner of DOCS facility operations), The Reverend Earl Moore (DOCS Assistant Commissioner for Ministerial and Family Services), Elizabeth VandeWal

---

1. Defendants do not contest the fact that Rastafarianism is a religion. Deft's Post-trial Reply Memorandum, p. 1; Stenographer's Minutes of trial ("SM") 17–19.

(DOCS Assistant Director for Nutritional Services) and Louis Passara (DOCS Director of Correctional Nutritional Services).

## DISCUSSION

The First Amendment to the Constitution states in part "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Every prison inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed. 2d 495 (1974); *see also Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed. 2d 447 (1979); *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Recognizing that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) the Supreme Court has tempered its scrutiny of challenged prison regulations. *See e.g., Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Turner*, 107 S.Ct. at 2262.

In *Turner*, the Supreme Court identified four factors relevant to whether a challenged prison regulation is valid as reasonably related to legitimate penological interests. The first is whether there is a valid, rational connection between the regulation and the government interest put forward to justify it, which must be legitimate and neutral as to content. The second is whether alternative means of exercising the right remain open to inmates. The third consideration is the impact that ac-

commodation of the claimed right would have on guards, other prisoners, and the allocation of prison resources. Finally, the "absence of ready alternatives is evidence of the reasonableness of a prison regulation," while the existence of easy alternatives may show that a regulation is not reasonable, but is an exaggerated response to prison concerns. *Turner*, 107 S.Ct. at 2262.

### The Challenged Regulations

1. The Initial Haircut

Many Rastafarians take the "vow of the Nazarite" never to cut their hair or beard. Inmate witnesses testified that the wearing of dreadlocks is a "consecration" and a "covenant" with God. The source of the belief is both Biblical (identified by inmate witnesses as Leviticus 6 (SM 51), Numbers 6 (SM 307)) and symbolic of Haile Selassie, whose Nyabinghi warriors wore their hair in dreadlocks. The matted look of the hair is symbolic of a lion, and therefore of Haile Selassie, who is revered by Rastafarians as "the lion of Judah." The vow is of central importance to most Rastafarians. Ernest Nurse testified that the wearing of dreadlocks is "very holy" (SM 278).

Not all Rastafarians take the vow of the Nazarite. Three groups that are located in Jamaica, the "beard men," the "clean-shaven men" and the "Combsone tribe" do not wear dreadlocks. All of the prisoners who testified wear their hair in dreadlocks.

Departmental Directive No. 4914 requires that all male inmates submit to a haircut and shave for the taking of an initial identification photograph. Defendants argue that an initial clean-shaven, short-haired photograph is necessary for security reasons. Deputy Commissioner Philip Coombe testified that a clean-shaven,[2] short-haired photograph is necessary to show the inmate's facial and cranial structure, which are important identifying features in case of an escape, because a fugitive could radically alter his appearance by cutting his hair. He testified that

---

**2.** Plaintiffs do not challenge the requirement of an initial facial shave for identification pur-

poses. Ptfs' Post Trial Mem., pg. 10.

a picture with the inmate's dreadlocks pulled back is not adequate for identification purposes, and that DOCS has experienced security problems with other inmates who feel that the Rastafarians are being given special treatment.

▮ The haircut issue has already been determined adversely to defendants in two state court cases, *Lewis v. Commissioner of the Department of Correctional Services*, No. 85–11167, slip op., (Sup.Ct. August 1, 1985), *aff'd sub nom.*, *People v. Lewis*, 115 A.D.2d 597, 496 N.Y.S.2d 258 (App.Div. 1985), *aff'd*, 68 N.Y.2d 923, 510 N.Y.S.2d 73, 502 N.E.2d 988 (1986) and *Overton v. Dep't of Correctional Services*, 131 Misc. 2d 295, 499 N.Y.S.2d 860 (Sup.Ct.1986), *aff'd*, 133 A.D.2d 744, 520 N.Y.S.2d 32 (App.Div.1987), *appeals dismissed*, 72 N.Y. 2d 838, 530 N.Y.S.2d 551, 526 N.E.2d 42 (1988). This court determined in August 1986 that defendants are precluded from relitigating the issue by the doctrine of collateral estoppel. *Benjamin*, 643 F.Supp. at 357. Defendants have failed to convince the court that that determination should be changed.

Defendants argue that non-mutual offensive collateral estoppel should not be applied against a state government. *See United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *Hercules Carriers, Inc. v. Florida*, 768 F.2d 1558 (11th Cir.1985). In *Mendoza*, the court held that such estoppel should not apply against the federal government because of the nature and number of cases that the government litigates, and the fact that policy considerations may determine whether the government will appeal an adverse decision, unlike a private litigant. In *Hercules Carriers*, the court applied the rationale of *Mendoza* to state governments. The court relied on the fact that plaintiffs were seeking to preclude a state agency from relitigating an issue that had been previously determined in an administrative proceeding brought by a separate state regulatory agency. *Id.* at 1580.

The decision to apply offensive collateral estoppel must be made with discretion. *Parklane Hosiery Co. v. Shore*, 439 U.S.

322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979). Here, the same state agency, DOCS, litigated and lost the issue in the state courts. The agency had a full and fair opportunity to litigate, and the identical issue was actually litigated and actually decided. The agency was aware that this action was pending at the time the state actions were decided, and so had a strong incentive to appeal the adverse decisions. Therefore, it is not unfair to prevent defendants from relitigating the issue in this case. *See Benjamin*, 643 F.Supp. at 356–57.

▮ Even if DOCS were not precluded from relitigating the issue, Departmental Directive No. 4914 does not withstand scrutiny under the analysis set forth in *Turner*. Applying that analysis, one must grant there is a rational connection between the haircut requirement and the security objective put forth by defendants to justify it. Equally apparent is that alternative means of exercising the right do not remain open to plaintiffs. (Defendants' argument that an inmate may re-grow his hair to any length, after the reception haircut, misses the point of the violence done to his religious beliefs when his hair is cut.)

Defendants argue that the accommodation impact is great, because Rastafarian inmates must be segregated at reception, and processed either first or last, and that other inmates resent their being given special treatment. However, the accommodation impact is no greater than the practice prior to entry of the preliminary injunction, when Rastafarian inmates who refused to submit to a haircut were segregated and placed in involuntary protective custody, or had their hair cut by force.

The decisive factor in the analysis of the haircut issue is the availability of an obvious, easy alternative. The photographs that were submitted to the court showing the inmates' hair pulled back in a rubber band or a hairnet, demonstrate that such photos are adequate for security purposes. They show clearly the facial structure and features, and I find Mr. Coombe's testimony to the contrary unpersuasive. The availability of this easy and practical alter-

native demonstrates that the regulation is an exaggerated response to the perceived escape threat. That conclusion accords with those repeatedly reached by the New York State courts, when the issue was presented to them, that "the asserted objective of the regulation in issue could be fully achieved simply by pulling his hair back when the initial identification photographs are taken", *Lewis*, 68 N.Y.2d at 925, 510 N.Y.S.2d 73, 502 N.E.2d 988, and that "Directive No. 4914 constitutes an impermissible infringement of the plaintiff's constitutional right to fully exercise his religion." *Overton*, 133 A.D.2d at 745, 520 N.Y.S.2d 32.

Plaintiffs would prevail on this issue even in the absence of the preclusive effect given to the state opinions, and plaintiffs are entitled to a permanent injunction on this issue.

## 2. The Religious Crown

■ The crown is worn as a Rastafarian tradition, to keep impurities from the dreadlocks, to shield them from the eyes of non-Rastafarians, and to keep the curious from touching them. Not all Rastafarians wear crowns, and those who do vary in the degree they observe the practice. Most crowns are large, loosely knit or crocheted circular wool caps, many in the green, red, and gold of the Ethiopian flag. However, Rastafarians wear hats of other descriptions to cover their dreadlocks.

Defendants contend that the crown is a security risk. The large, loose crown may be used for hiding contraband. Searching the crown necessitates increased contact between guards and inmates. The increase in close personal contacts in turn increases the threat of confrontations between guards and inmates, with its security risks.

Prohibitions on wearing the crown are not uniform throughout DOCS facilities. For instance, David Daley testified that at Green Haven, a maximum security facility, he is allowed to wear his crown everywhere but in the mess hall and the visiting room, while Edward Jamison testified that he was not allowed to wear his crown anywhere at Wyoming, a medium security facility, or Lincoln, a minimum security facility.

Application of the *Turner* four-part test demonstrates that defendants' regulations governing the wearing of the religious crown do not impermissibly infringe on plaintiffs' First Amendment rights. There is a valid, rational connection between the prohibition on crowns in certain areas and the security interests put forward to justify it. The crown is a large, loose-fitting cap that may fairly readily be used for concealing and transporting weapons, controlled substances or other contraband, thus posing a threat to prison security and the safety of other inmates. Plaintiffs argue that the regulation is not neutral because Jewish and Muslim inmates are allowed to wear yarmulkes and kufis throughout the prisons. However, yarmulkes and kufis are smaller and fit closely to the head, while the crown is of a size and shapelessness which would facilitate uses which are legitimately forbidden.

Alternative means of exercising the right are available to inmates. They are allowed to wear the crown in their cells and at other times and in other areas that the prison administration determines do not pose a security threat. The fact that regulations on the wearing of crowns differ among institutions reflects responses to the different security concerns of each individual institution, illustrating that this is an inappropriate area for the court to substitute its judgment for those of the prison administrators.

The accommodation impact on guards and other prisoners would be substantial. The increased number of searches that would be required if inmates were allowed to wear their crowns at all times would threaten increased confrontations between guards and inmates, perhaps requiring a reallocation of prison resources.

There appears no easy alternative to the restriction. This may simply reflect the fact that already the crown is allowed in many areas, indicating that the most workable adjustments are in place.

In *Standing Deer v. Carlson*, 831 F.2d 1525 (9th Cir.1987), the court applied the

*Turner* four-part test and upheld a prison regulation that forbids the wearing of religious headbands by Native Americans in the mess hall. The court held that "it is clear that the dress regulation involved in this case is logically connected to the concerns of cleanliness, security, and safety that were invoked to justify it." *Id.* at 1528. The court rejected the prisoner's contention that increased inspection provided an easy alternative, holding that the security threat posed by increased guard-to-inmate contact "would adversely affect penal objectives." *Id.* at 1529.

Plaintiffs have not met their burden of showing that the restriction on the wearing of the religious crown impermissibly infringes on their constitutional rights.

### 3. The Ital Diet

■ Ital symbolizes a belief in life and an avoidance of symbols of death. Individual dietary practices vary widely among Rastafarian individuals and sects both inside and outside prison. In general, Rastafarians do not eat meat, and almost universally refrain from eating pork. Most Rastafarians abstain from alcohol and caffeine. Some Rastafarians do not eat fish, and some refuse dairy products. Some refrain from eating any foods that have been processed, particularly canned food, believing that the can symbolizes a coffin, or death. Some Rastafarians refuse to eat vegetables that have been cooked for more than a few minutes, believing that overcooking destroys the food's natural value. Rastafarians also object to vegetables that have been treated with non-organic pesticides or fertilizers.

Some Rastafarians will only eat food that is prepared and served in pots and bowls made of natural materials: more specifically, clay pots and calabash bowls. Some Rastafarians will eat only food that they have prepared themselves. Others refuse food that has been prepared by a woman during her menstrual period. Some of the inmates who testified eat meat, dairy products, fish, canned foods from the commissary, and bread made from processed flour.

Whenever pork is served, DOCS provides a meat substitute to all inmates to accommodate the religious requirements of Jewish and Muslim prisoners. No such substitute is offered when other meats are served. They also offer a kosher food program at Green Haven Correctional Facility, and a neutral diet at other facilities to inmates who have been in the Green Haven program. Most of the vegetables served in DOCS institutions are canned or frozen, because they are more cost-effective and because fresh vegetables are not available all year. Vegetables are prepared by steaming for a maximum of fifteen minutes.

The use of clay or calabash pots and bowls is impracticable because clay is breakable, and it violates New York food preparation regulations which forbid the use of wooden working surfaces other than hard maple. Porous materials can retain and breed harmful bacteria.

It would be both expensive and a severe administrative burden for defendants to provide Rastafarian inmates with a diet containing only natural foods and nutritionally adequate meat substitutes.

Other prisoners understandably resent special treatment that is given to any group, and the possibility of tension and confrontation is particularly troublesome at mealtime, which is often the only time the entire prison population is together.

Defendants provide Orthodox Jewish prisoners with kosher or neutral meals. They provide special meals during Ramadan, and meat substitutes so that Muslim prisoners can follow their religious proscription against pork. To that extent, they do not appear "neutral" as between Jews and Muslims on the one hand and Rastafarians on the other. But the inequality of treatment, if it is perceived as such, reflects the fact that it would be much more difficult to accommodate the Rastafarians because their definitions of an Ital diet are so varied. The complex of dietary restrictions that plaintiffs described would impose undue financial and administrative burdens on defendants to provide

an Ital diet that met with the religious views of every Rastafarian inmate.

Plaintiffs do have alternative means of exercising the right: they may receive food from the outside through the prison package rooms, and they may buy food at the prison commissary. They may also abstain from eating any food provided in the mess hall that offends their religious beliefs. Although it may not be acceptable to all Rastafarians, those who do not reject all dairy products may obtain a nutritionally adequate "ovo-lacto" (i.e., including eggs and dairy products) diet even abstaining from all meat, fish and poultry. *See Udey v. Kastner*, 805 F.2d 1218 (5th Cir.1986) (prisoner's request for a natural food diet, based on sincerely held beliefs, refused on the basis that it would create undue costs and administrative burdens, and have a potentially disruptive effect on prison discipline).

*Kahane v. Carlson*, 527 F.2d 492 (2d Cir.1975), held that the state must provide kosher meals to Orthodox Jewish inmates. Factually, there were few Orthodox Jewish inmates in the custody of DOCS. Further, Kahane sought meals that complied with the laws of Kashruth, which are more well-defined than the dietary practices described by plaintiffs. Defendants' practices here do not run afoul of *Kahane*, read in the light of *Turner* and *O'Lone*, nor do they impermissibly infringe on plaintiffs' First Amendment or Equal Protection rights.

## 4. Congregate Religious Services

■ In Jamaica, weekly congregate services last for two days and holiday celebrations last for two weeks. The nature of the services that are held in Jamaica, and the type of services that the prisoners seek, is unclear. DOCS has available no body of established religious doctrine on which it can rely in determining the particular rituals or practices which are appropriate to the Rastafari. Marlon Clarke testified that a typical prayer service in Jamaica would be presided over by an elder, and would

involve singing, dancing, chanting and Biblical readings.[3] Ernest Nurse testified that a typical prayer service would consist of psalm readings, prayer and Bible discussion. Jah Bunny testified that meetings of Caribbean African Unity, a DOCS-approved cultural organization, begin and end with a prayer, and that a typical religious service would consist of an opening and closing prayer, "reasoning" and playing of drums and chanting.

DOCS will "allow Rastafarians to hold congregate services when and if ... an outside sponsor comes forth." (Defts' Post-trial Reply Mem., p. 3). Requiring a sponsor from the outside is a reasonable method of authenticating, and maintaining the integrity of, the spiritual purposes of the meeting and its practices. It comports with the institution's responsibility to see that the religious services are genuine and bona fide, and not used as an occasion for extortion, for the holding of kangaroo courts, or for the dissemination of conspiratorial information. (SM 558–9). The free-world-sponsor requirement has been upheld for the same reasons given by defendants. *See Hadi v. Horn*, 830 F.2d 779 (7th Cir. 1987); *Tisdale v. Dobbs*, 807 F.2d 734 (8th Cir.1986). Its purpose is not to enforce doctrinal conformity, as plaintiffs protest, but to assure that the inmates' meeting serves its professed religious purposes rather than temporal ones which might threaten security. Section 610 of the New York Correction Law provides for religious services "from some recognized clergyman of the denomination."

No sponsor has come forward who has been approved by DOCS. Carol Yawney, an associate professor of anthropology at York University in Toronto, offered to organize a holiday celebration, but DOCS reasonably refused on the basis that she is an academic, not a religious authority. Mr. Daley testified that the tenets of Rastafari do not allow a woman to lead services for men (SM 183). The Reverend Earl Moore testified to good faith attempts he has

---

**3.** It also involves "sharing of the chalice" which is the burning of the "holy herb," i.e., marijuana, (SM 327) but it is assumed that plaintiffs wish congregate services even without that element.

made to locate and obtain the services of a sponsor.

Nor would the use of inmate religious leaders be acceptable, because inter-inmate leadership struggles pose a security problem. Although some Muslim services are led by inmate imams, they are supervised by outside imams, and DOCS ministerial personnel have an outside resource to contact concerning religious issues. In addition, Phillip Coombe testified that DOCS is hiring more outside imams to lead services in the prisons, because the use of inmate imams is a security problem. Finally, defendants object on the ground that Jamaican dialect would be spoken during religious services, and that they would have no way of knowing what was being said or controlling what went on during the service.

There is a valid, rational connection between defendants' security concerns and the requirement that a religious group have an outside sponsor in order to conduct congregate religious services. The requirement applies to all religious groups.

There are alternate, although limited, means of expressing the right that remain open to prisoners. They may pray individually in their cells, and may "reason" with other inmates in small groups. Mr. Daly testified this was an adequate substitute for prayer services (SM 172). The meetings of Caribbean African Unity begin and end with Rastafarian prayers. No other easy alternative appears feasible.

Under the circumstances, DOC's position that congregate services await only the presence of an outside sponsor comports with *Turner* and *O'Lone*, and represents a reasonable penological restriction.

## CONCLUSION

For the foregoing reasons, defendants are permanently enjoined from enforcing Departmental Directive No. 4914 against members of the plaintiff class. The remainder of plaintiffs' claims are dismissed.

Defendants are to submit a judgment, on consent as to form if possible, within thirty days of the date of this order. By the same time, plaintiffs may submit a counter-judgment reflecting matters of form that cannot be agreed upon.