OPINION OF THE COURT
Dominic R. Massaro, J.
Prior to the institution of this action, plaintiff had been arrested and charged with the crime of criminal sale of a controlled substance in the third degree (Penal Law § 220.39 [1]). As a criminal defendant, Mr. Brown was unable to post bail. Seeking an alternative to incarceration, this admitted drug dependent attempted to obtain admission to an in-patient drug treatment program. In due course, Daytop Village, Inc. (hereinafter Daytop) accepted him, and he was paroled to its custody.[1]
On the day following his parole, Mr. Brown, a Rastafarian, was dismissed from the residential drug treatment program. This because of a refusal to allow the cutting of his rope-like hair strands, referred to as "dreadlocks,” pursuant to program regulations. This gives rise to the instant action wherein plaintiff charges that Daytop’s residential drug treatment program is a "clinic” and, as such, under our Human Rights Law (Executive Law § 292 [9]), a place of public accommodation which has discriminated against him on the basis of *250 creed[2] (Executive Law § 296 [2] [a]). He seeks declarative and injunctive relief, in addition to monetary damages, for averred infringement upon the free exercise of his religion.[3] The judgment sought is denied and the matter dismissed.
Pendite lite, by order to show cause, Mr. Brown had sought to obtain a preliminary injunction, enjoining Daytop from refusing to admit him unconditionally into its residential treatment program. Said petition was earlier denied (see, Brown v Daytop Vil., NYLJ, Dec. 3, 1992, at 27, col 3).
Daytop’s contentions are procedural as well as substantive. As to the latter, they are threefold: that it does not fall within the proscription of the human rights statute because it is neither a "clinic” nor a place of public accommodation within the meaning of section 292 (9) and section 296 (2) (a), respectively; that were it otherwise to be found, the requisite element of intent to discriminate "because of’ Mr. Brown’s religious belief is lacking. In either event, defendant maintains that plaintiff is not entitled to treatment on demand. In the alternative, it challenges the sincerity of plaintiffs Rastafarian belief.
Interestingly, there have been no reported cases dealing with drug rehabilitation program regulations vis-á-vis the right to religious expression.
*251 I
Treating first with the procedural concern, it is too late in the day to suggest that statutes are not inherently proper subjects of declaratory relief; questions as to the construction of a statute may be entertained in declaratory judgment proceedings commenced in appropriate superior courts, provided there is, as here, an actual or justiciable controversy to be determined. It is beyond cavil that declaratory judgment proceedings are particularly appropriate to determine questions as to the interpretation of a statute, and any rights or entitlements that may flow therefrom; and that courts of equity may issue injunctions considered essential to justice, independent of statutory provisions specifically conferring this inherent power.
Under New York law, "it [is] an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation * * * because of the * * * creed * * * of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof’ (emphasis added) (Executive Law § 296 [2] [a]).
The statutory definition of "place of public accommodation” is found at section 292 (9) of the law. It is widely illustrative and inclusive of "clinics.” Whether Daytop’s residential treatment program falls within this definitional ambit, as claimed by plaintiff, is a question of fact.
Daytop is a private, Manhattan-based not-for-profit organization of wide note. Licensed by the State of New York[4] and enjoying significant government support by way of enabling grants and contracts for its services, Daytop has developed and conducts State-approved residential and nonresidential drug treatment programs. Within this area of expertise, Day-top also provides technical assistance, training and sometimes supervision far beyond the confines of New York. Likewise, it is in consultative status with the United Nations.
By way of contrast, Daytop’s residential drug treatment program is regulated by strict conformance with uniform standards for admission, and thereafter for continued treat *252 ment in a "therapeutic community.” These uniform standards were early on designed by medically supervised trial and error experimentation. They have since been maintained with a quarter century of regulatory consistency. The essential function of this particular program model is the imposition of behavioral mandates to break — psychologically as well as physically — individuals addicted to drugs away from destructive life patterns. Initially, all residents in a successively formed therapeutic community commence the program on equal footing, that is, in an environmental setting bereft of personal privilege. As each individual progresses in 24 to 36 months of phased therapy, he or she "earns” back, as "privileges,” certain elements of their "individual style.” This process is designed to teach residents self-discipline and the rewards of managed behavior. Observing that everyone else in the Daytop residential setting must "earn” "privileges” is a crucial lesson aimed at preparing residents for their return to society. Upon a resident "earning” the "privileges” which he or she wants to maintain in a drug-free life, that individual will be considered for honorable discharge from the program.
As one of a plethora of entry-level regulations in its therapeutic methodology, Daytop requires that hair be cut upon admission into the residential drug treatment program, and worn at common length without distinctive style. With this regulation, plaintiff refused to conform.
II
Clinic is a "common word of clear import” (Matter of Sattler v City of New York Commn. on Human Rights, 180 AD2d 644, 646 [2d Dept 1992]). Its plain meaning, as reflected in several widely used dictionaries, is "a facility * * * that is devoted to the diagnosis and care of outpatients” (American Heritage Dictionary [3d ed 1992]); "a facility * * * for diagnosis and treatment of outpatients” (Webster’s Ninth New Collegiate Dictionary [1986]); "a place * * * for the treatment of nonresident patients” (Random House College Dictionary [rev ed 1982]); "a center for physical examination and treatment of ambulant patients who are not hospitalized” (Taber’s Cyclopedic Medical Dictionary [13th ed 1977]); or "an institution connected with a hospital or medical school where diagnosis, and treatment are made available to outpatients” (Webster’s Third New International Dictionary 423 [1964]).
Further, the statutory language encompassing the idea of *253 public accommodation states two aspects: the idea of accommodation in the broad sense of providing convenience and services to the public with little or no restriction, and the idea of place (see, Matter of United States Power Squadrons v State Human Rights Appeal Bd., 59 NY2d 401 [1983]).
Assuming, arguendo, that Daytop were to be found a public accommodation under the State’s Human Rights Law, at most it would be obliged not to discriminate against plaintiff "because of’ creed (Executive Law § 296.2 [a]); no provision exists in the statute requiring a public accommodation to make affirmative accommodations to religious practices of its prospective patrons. Even in the context of employment (where more is required of a covered entity than in the arena of public accommodation), our Court of Appeals requires proof of actual intent to discriminate as a prerequisite before a claim of religious discrimination may be sustained (see, Matter of Eastern Greyhound Lines v New York State Div. of Human Rights, 27 NY2d 279 [1970]). No such intent has been demonstrated here; indeed, no such intent has been alleged.
It should be recalled in this respect that an alternative means of exercising the claimed right has always been available to this plaintiff. Daytop’s nonresidential drug treatment program is designed not to disrupt functional aspects of personal life and is free of residential "therapeutic community” modality. In this instance, Mr. Brown chose not to avail himself of its proffer.
Moreover, as our Court of Appeals also has held, "the two concepts” of " 'religious discrimination and failure to accommodate’ * * * 'are entirely different’ ” and (except for an employer’s limited obligations with respect to Sabbath and religious holiday observance), the Human Rights Law imposes no duty to accommodate religious practices (see, Eastern Greyhound Lines v New York State Div. of Human Rights, supra, at 285, quoting with approval Dewey v Reynolds Metals Co., 429 F2d 324, 335 [6th Cir 1970], affd 402 US 689 [1971]).
Ill
While it has been held "entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity * * * of someone’s religious belief in * * * the free exercise context” (Philbrook v Ansonia Bd. of Educ., 757 F2d 476, 481 [2d Cir 1985], affd 479 US 60 [1985]; see also, Benjamin v Coughlin, 708 F2d 570 [SD NY 1989], affd 905 F2d 571, cert denied 498 *254 US 951 [1990], supra; United States v Ballard, 322 US 78 [1944]), the courts are hardly the arena for gouging the extent of knowledge or depth of fervor of such religious conviction.
At bar, plaintiffs knowledge of Rastafari was, in a word, scanty. He did not know either its history or contemporary culture; he likewise was unaware about its scriptural tenets or hierarchy; nor did he know more than little about its dietary restrictions. Indeed, he was unaware of the "vow of the Nazarite,” the issue at hand, that is, male forebearance from the cutting of one’s hair; or, for that matter, was he aware of the fact that certain Rastafarian sects choose not to style their hair in the formation of dreadlocks. The defense was not inaccurate in suggesting that "plaintiff’s beliefs leave a lot to be desired.”
But efforts to discredit plaintiff in this respect were misspent. Mr. Brown testified, "I follow through what I know and what I believe and how I feel about it.” He told of being raised a Rastafarian, of his father explaining "the ways,” of his engaging in dialogues about the meaning of scripture, known as "reasoning,” and of the personal significance of wearing his hair in dreadlocks. This he equated with spiritual strength found in certain biblical passages considered sacred. That plaintiff’s conscience is satisfied by something less than full communion with the tenets of his religion is not sufficient reason to reject his plea. To do so would place the court in the untenable position of promoting religious orthodoxy. Once, as here, its sincerity has been established, religion is a matter best left between a believer and his beliefs (see, Sherbert v Verner, 374 US 398 [1963]; see also, Reynolds v United States, 98 US 145, 164 [1878], quoting Thomas Jefferson that "religion is a matter which lies solely between man and his God”).
IV
Is there a valid, rational connection between the program regulations at issue and the interest put forward to justify it?
Defendant’s survival as a successful in-patient drug treatment program is predicated upon selectivity. Its machinery screens, evaluates and admits applicants on a wholly objective basis. Its facilities are operated with strict discipline for the benefit of applicants who have been admitted into its therapeutic residential drug treatment program. At any given time, the number of people who are so accommodated is limited to approximately 2,500 beds available in various geographically *255 separated facilities. It was uncontroverted that Daytop’s discipline is essential to its documented success in the rehabilitation of lives eviscerated by drugs. Highly skilled personnel oversee and administer activities in furtherance of this mission. The maintenance of Daytop’s controlled environment as a normative culture is central to its pursuit. Given the neutral content and application of its regulatory enforcement, then, the answer must be in the affirmative (cf., Benjamin v Coughlin, supra; Overton v Coughlin, 133 AD2d 744, appeal dismissed 72 NY2d 838 [1988] [practical alternative(s) to perceived threat of escape in penal institution may permit wearing of dreadlocks]).
To suggest that regulation management of this kind lends itself to large scale public accessibility, as does a "clinic,” would be an unwarranted declaration (cf., Sattler v City of New York Commn. on Human Rights, 180 AD2d 644, supra [dental practice not a "clinic”]; Elstein v State Div. of Human Rights, NYLJ, Aug. 18, 1988, at 2, col 3 [Onondaga County], revd on other grounds 161 AD2d 1157 [4th Dept 1990], lv denied 76 NY2d 710 [orthopedic practice not a public accommodation]). Furthermore, our courts have consistently restricted accessibility in this regard, holding that New York is not a "[drug] treatment on demand” State (Palmieri v Cuomo, 170 AD2d 283, lv denied 78 NY2d 852 [1991]; see also, Smith v Follette, 445 F2d 955 [2d Cir 1971]).
Daytop’s mandates, it is clear, are uniformly applied to members of all religious persuasions. In that Rastafarians are not singled out for treatment different from treatment afforded to those of other beliefs, its haircut regulation is not suspect. To cast aside a medical discipline found to be therapeutically salient not only for any given individual resident, but for Daytop’s entire residential population, would be a fundamental alteration in the nature of its residential treatment program (cf., Southeastern Community Coll. v Davis, 442 US 397 [1979] [under regulation requiring reasonable accommodation of people with disabilities, nursing program nonetheless need not alter training program for deaf student]).
An exception, were one to be entertained, would not simply impose an undue hardship to, but an inconsistency in Daytop’s residential drug treatment program’s cultural norm. The resentment and tension such exception could cause among residents, for instance, would strike at the essence of the program, and be destructive of the highly specialized "therapeu *256 tic community” methodology and its record of documented success.
To visit on Daytop the extraordinary remedy of commanding a special accommodation for plaintiff would violate the "discipline” essential to the laudable rehabilitative goal it espouses as its special mission (cf., Goldman v Weinberger, 475 US 503 [1986] [wearing of yarmulke in contravention of military ban on unofficial headgear is violative of discipline essential in military function]). Unchallenged expert testimony established Daytop as a relatively unique entity in breaking the devastating cycle of drug addiction. Deference must be paid to the medical judgment that has allowed it to attain this station by appropriate treatment (cf., Elaine W. v Joint Diseases N. Gen. Hosp., 180 AD2d 525 [1st Dept 1992], summary judgment dismissal revd 81 NY2d 211 [1993][5] [determination to exclude pregnant substance abusers from hospital’s in-patient detoxification program not gender-based discrimination, but justified on medical grounds]). Indeed, "courts should be particularly deferential to * * * informed discretion” (cf., Turner v Safley, 482 US 78, 90 [1987] [the barring of inmate-to-inmate correspondence is reasonably related to penalogical security interests]).
Plaintiffs right to exercise his creed is not unbounded. It must be viewed and evaluated in light of its contextual setting. On this record, any infringement of Mr. Brown’s religious expression occasioned by implementation of the requirement that he cut his hair is outweighed by the medically warranted validity of Daytop’s legitimate institutional objective. Daytop has met the burden of proving the regulation is based upon medical necessity, not upon discrimination based on religious belief.
Nor is it of little moment that while a private entity, Daytop is closely monitored by the State, infused with its support and fraught with its overriding and significant interest in the responsibility to care for, treat and rehabilitate citizens whose lives are ravaged by substance abuse and/or dependence. This in furtherance of the State’s comprehensive plan toward attaining the common aspiration to a drug-free society.[6]
*257 For all the foregoing reasons, the judgment sought is denied and the matter dismissed.

. While Daytop maintains that it does not accept parole custody of criminal defendants, and that plaintiff was merely "released from custody upon the condition that he remain enrolled in Daytop’s [in-patient drug] treatment program”, it does not deny plaintiff’s averment to the contrary. The court record is likewise illuminating: only parole custody was stated to be an acceptable alternative to Mr. Brown’s continued incarceration; and, in fact, a Daytop representative appeared for the purpose of accepting custody and escorting plaintiff to an in-patient treatment facility on the date of his release.
The court questions Daytop’s posture in this respect. It considers the matter one of grave concern given the organization’s special relationship with the State. Its status as an integral part of a network of substance abuse service facilities approved for criminal court referrals demands review in light of this perception.

. Rastafari is a religion with roots in Jamaican culture. It has no hierarchy of religious authority, although Rastafarians recognize some who have studied the religion extensively as "elders,” and no single religious text setting out the central tenets of Rastafarian belief, although Rastafarians consider certain Bible passages sacred. There are several Rastafarian sects, with differing beliefs and practices.
The most widely accepted Rastafarian principles include beliefs in the divinity of Ethiopian Emperor Haile Selassie and that the hair and beard should never be cut. Many Rastafarians wear their hair uncut, uncombed, and called "dreadlocks.” Many believe that the dreadlocks should be covered at all times, except when praying, and wear a religious "crown” — a loose knit or crocheted headcovering — to protect their dreadlocks. Rastafarians engage in dialogues about the meaning of scripture, known as "reasoning,” and conduct weekly group services that last from a few hours to several days. They also hold religious celebrations on Haile Selassie’s birthday and on the anniversary of his coronation. The green, red, and gold colors of the Ethiopian flag and the lion, which symbolizes Haile Selassie, are sacred symbols. Many Rastafarians follow what is known as an "Ital” diet, abstaining from meat, liquor, and caffeine, and eating only natural foods, although there are variations in these practices. (Benjamin v Coughlin, 708 F Supp 570, 571 [SD NY 1989].)

. Defendant does not contest the fact that Rastafarianism is a religion.

. The State Office of Alcoholism and Substance Abuse Service (OASAS) is charged with the certification of and oversight for all substance abuse services in the State of New York (Mental Hygiene Law § 19.07 [b]; § 23.01 M).

. "Nonetheless, North General’s policy is supportable if the hospital can establish * * * that the blanket exclusion is medically warranted” (Elaine W. v Joint Diseases N. Gen. Hosp., 81 NY2d 211, 217 [1993], supra).

. Judicial notice is taken of the "terrible toll on our society” succes *257 sively proclaimed by the Governor(s) of New York respecting the problem of drug abuse and addiction in this State (see, e.g., Governor’s Mem approving L 1992, ch 223, 1992 McKinney’s Session Laws of NY, at 2879). The creation of a new framework, the OASAS, by consolidation of earlier State efforts to improve the ability to respond to the needs of countless New Yorkers so affected is the State’s declared policy (L 1992, ch 223; see also, Mental Hygiene Law § 19.01).