Thomas BENJAMIN, Errol Dunkley, Frank Forrest, Barrington Gray, Newton Hannon, and Martin Spence, on behalf of all others similarly situated, Plaintiffs–Appellants, Cross–Appellees,

v.

Thomas A. COUGHLIN, Commissioner, New York State Department of Correctional Services; Stephen Dalshiem, Superintendent, Ossining Correctional Facility; Eugene S. LeFevre, Superintendent, Clinton Correctional Facility; Harold Smith, Superintendent, Attica Correctional Facility, Defendants–Appellees, Cross–Appellants.

Nos. 501, 502, Dockets 89–2265(L), 89–2267.

United States Court of Appeals, Second Circuit.

Argued Dec. 13, 1989.

Decided May 18, 1990.

Robert Selcov, New York City (Stephen M. Latimer, David C. Leven, Prisoners' Legal Services of New York, Poughkeepsie, N.Y., of counsel), for plaintiffs-appellants, cross-appellees.

Dennis J. Saffran, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of State of N.Y., New York City, of counsel), for defendants-appellees, cross-appellants.

Before VAN GRAAFEILAND, PIERCE and MINER, Circuit Judges.

MINER, Circuit Judge:

Plaintiffs, Rastafarian inmates in the custody of the New York State Department of Correctional Services ("DOCS"), appeal from a judgment entered in the United States District Court for the Southern District of New York (Stanton, *J.*) rejecting claims, brought pursuant to 42 U.S.C. § 1983 (1982), that various regulations and policies of DOCS violate their first amendment right to free exercise of their religion and their fourteenth amendment right to equal protection of the laws. *Benjamin v. Coughlin,* 708 F.Supp. 570 (S.D.N.Y.1989). Specifically, the district court rejected plaintiffs' contentions that they were entitled to weekly congregate prayer, unrestricted wearing of religious headgear and a diet consistent with their religious beliefs.

Defendants, the Commissioner of DOCS and three correctional facility superintendents, appeal from so much of the judgment as enjoins the enforcement of a regulation requiring members of the plaintiff class to submit to a haircut upon admission to a facility under defendants' jurisdiction. The district court found that defendants were precluded from enforcing the regulation under the doctrine of collateral estoppel, and that the regulation violates the free exercise clause of the first amendment. Defendants contend that the regulation is reasonably related to valid penological interests and that litigation of the issue was improperly precluded by the district court.

For the following reasons, we affirm.

## BACKGROUND

The Rastafarian religion [1] was founded in Jamaica. Adherents believe that the coronation of Haile Selassie, the deceased emperor of Ethiopia, constituted the fulfillment of a prophesy. Aside from the belief in the divinity of Haile Selassie, the religion is marked by a decentralized structure and the absence of a conventional religious hierarchy. The closest example of an authoritative figure is an "Elder," one who has studied the tenets of the religion.

A fundamental tenet of the religion is that a Rastafarian's hair is not to be combed or cut, resulting in rope-like strands known as "dreadlocks." Directive 4914 of the DOCS, however, requires all newly admitted males to submit to a haircut and photograph upon arrival at a DOCS facility. Male inmates are then permitted to regrow their hair to any length and are subject to rephotographing if their appearance changes drastically.

Plaintiffs also believe that, whenever they are in public places, their dreadlocks must be covered by loose-fitting knit headgear known as "crowns." Under current policy, crowns may be worn only in designated areas of DOCS facilities. Jewish and Muslim inmates, however, are permitted to wear their respective religious headgear throughout the prison facilities, subject to frisk searches.

Rastafarians engage in congregate religious observance—"Issembly"—which consists of chanting, beating of drums, readings, and religious conversation called "reasoning." [2] Plaintiffs have been denied the right to congregate for weekly religious observance. This restriction is based on defendants' interpretation of New York Correction Law § 610 (McKinney 1987) as prohibiting religious congregation unless an outside spiritual sponsor is available to supervise the service. Although Muslim and Buddhist inmates are permitted to use inmate religious leaders, under the supervi-

---

1. Defendants do not raise the issue whether Rastafarianism is a religion protected by the first amendment. That issue has been resolved against them in state court. *Overton v. Coughlin,* 133 A.D.2d 744, 745–46, 520 N.Y.S.2d 32, 34 (2d Dep't 1987).

2. The Rastafarian service is also said to involve the smoking of marijuana. Plaintiffs, however, do not assert that they should be permitted to smoke marijuana during their services.

sion of an outside sponsor who is not present at the meeting, plaintiffs have not been permitted to use inmate leaders because no outside sponsor has come forward.

Many Rastafarians observe a strict vegetarian diet called "Ital," which includes prohibitions on the consumption of meat and caffeine and restricts the diet to natural foodstuffs. Dietary habits vary among Rastafarians, but consumption of pork seems to be prohibited generally. Under DOCS policy, alternative portions are offered to all inmates whenever pork is served, and special kosher meals are provided for inmates at some facilities. Muslim and Buddhist inmates are provided special meals during certain holidays.

In August 1986, the district court granted a preliminary injunction enjoining the enforcement of the initial haircut requirement as it applied to the plaintiffs. *Benjamin v. Coughlin*, 643 F.Supp. 351 (S.D.N. Y.1986). The court based this injunction on the preclusive effect of New York state court decisions in *Lewis v. Commissioner of the Dep't of Correctional Servs.*, No. 85–11167, slip op. (Sup.Ct. Aug. 1, 1985), *aff'd sub nom. People v. Lewis*, 115 A.D.2d 597, 496 N.Y.S.2d 258 (2d Dep't 1985), *aff'd*, 68 N.Y.2d 923, 502 N.E.2d 988, 510 N.Y.S.2d 73 (1986) (mem.), and *Overton v. Department of Correctional Servs.*, 131 Misc.2d 295, 499 N.Y.S.2d 860 (Sup.Ct. 1986), *aff'd*, 133 A.D.2d 744, 520 N.Y.S.2d 32 (2d Dep't 1987) (mem.), *appeal dismissed*, 72 N.Y.2d 838, 526 N.E.2d 42, 530 N.Y.S.2d 551 (1988). *Benjamin v. Coughlin*, 643 F.Supp. at 357.

Defendants moved to vacate the injunction in June of 1987 on the ground that the Supreme Court's decisions in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), altered the standard of review for prisoners' rights claims. The district court reserved decision and heard testimony without a jury on all of plaintiffs' claims. In its post-trial decision in 1989, the district court reaffirmed the application of nonmutual offensive collateral estoppel but also found that Directive 4914 did not pass constitutional muster under *Turner* and *Shabazz*. *Benjamin*, 708 F.Supp. at 573. The court enjoined enforcement of the haircut regulation as it applied to the plaintiff class but rejected plaintiffs' challenges to the denial of the right to congregate, to wear crowns, and to be provided with a special diet. *Id.* at 573–76.

## DISCUSSION

### I. Standards to be Applied

Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Recognizing that federal courts are ill-equipped to deal with the complexities of prison administration, the Supreme Court has accorded great deference to determinations of prison officials and fashioned "a lesser standard of scrutiny ... in determining the constitutionality of the prison rules." *Turner*, 482 U.S. at 81, 107 S.Ct. at 2257; *see also Shabazz*, 482 U.S. at 349, 107 S.Ct. at 2404.

The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261; *Shabazz*, 482 U.S. at 349, 107 S.Ct. at 2404. The *Turner* Court determined that the factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62; *Fromer v. Scully*, 874 F.2d 69, 72 (2d Cir.1989).

■ In addition to their first amendment claims, plaintiffs here assert that they have been denied equal protection by reason of treatment different from that afforded to other religious groups. While the *Turner / Shabazz* standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting. As to such claims, the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests. *See Williams v. Lane,* 851 F.2d 867, 877 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). We must determine whether "the ... groups are so similar that discretion has been abused." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136, 97 S.Ct. 2532, 2543, 53 L.Ed.2d 629 (1977).

## II. The Haircut Regulation

### A. *Issue Preclusion*

Departmental Directive 4914 requires that upon entry into a correctional institution all male inmates receive a haircut[3] for purposes of an identification photograph. Defendants maintain that the haircut highlights an inmate's facial and cranial features in the photograph, and thus facilitates recapture in the event of escape. After the initial haircut, an inmate is permitted to regrow his hair to any length but is subject to being rephotographed if his appearance changes drastically. The challenge to Directive 4914 is founded on the contention that it violates the inmates' free exercise clause rights. "Many Rastafarians take the 'vow of the Nazarite' never to cut their hair," believing that the wearing of dreadlocks is sacred. *Benjamin,* 708 F.Supp. at 572.

The district court enjoined enforcement of the Directive on two grounds. Applying the doctrine of offensive collateral estoppel, the court determined that the defendants were precluded from relitigating the validity of the Directive because the issue previously had been decided against them by the New York Court of Appeals in *Lewis* and *Overton. Id.* at 573. The court further determined that, even if preclusion was improper, Directive 4914 failed to pass constitutional muster under *Turner. Id.* We agree with both determinations.

■ On appeal, defendants challenge the application of the collateral estoppel doctrine on three grounds. They assert that there is an absence of identicality of issues between the state cases and the case here; that offensive issue preclusion should not apply against the government; and that a subsequent change in law renders preclusion improper.

In determining the preclusive effect given a state court judgment under 28 U.S.C. § 1738 (1982), a federal court must "give that judgment the same effect that it would have in the courts of the state under state law." *Cullen v. Margiotta,* 811 F.2d 698, 732 (2d Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *see Wilder v. Thomas,* 854 F.2d 605, 616 (2d Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989). Defendants argue that the prior proceedings involved only the validity of Directive 4914 as it applied to the individual inmates in those cases and not its constitutionality as applied to any other parties, including members of the plaintiff class. They note that the state courts found that DOCS objectives could be achieved by merely tying back the hair of those individual inmates during their initial photographs. *See Lewis,* 68 N.Y.2d at 925, 502 N.E.2d at 989, 510 N.Y.S.2d at 74; *Overton,* 133 A.D.2d at 746, 520 N.Y.S.2d at 34.

Application of the doctrine of collateral estoppel requires a finding of "the identicality of an issue necessarily decided in the prior action" and "a full and fair opportunity to contest the issue in the prior action." *Halyalkar v. Board of Regents,* 72 N.Y.2d

---

**3.** Male inmates also receive an initial shave; however, that facet of Directive 4914 was found to be constitutional in *Fromer,* 874 F.2d at 76.

261, 266, 527 N.E.2d 1222, 1224, 532 N.Y. S.2d 85, 87 (1988) (citation omitted). We are confronted here with the constitutional validity of Directive 4914 as it applies to the plaintiffs, a mixed question of law and fact necessarily confronted by the state courts in assessing the legitimacy of the security concerns raised by the DOCS. *See Lewis,* 68 N.Y.2d at 924–25, 502 N.E.2d at 989, 510 N.Y.S.2d at 74; *Overton,* 133 A.D.2d at 745–46, 520 N.Y.S.2d at 34.

In the district court, defendants presented much of the same evidence that they presented in the state courts, including testimony of Deputy Commissioner Coombe, various sets of photographs, and even photographs of Messrs. Lewis and Overton. The only set of photographs presented in the *Overton* case, however, was that of Mr. Overton. We find that, between the state and federal proceedings, there is a "substantial overlap" of evidence and arguments. *Restatement (Second) of Judgments* § 27 comment c (1982); *see Koch v. Consolidated Edison Co. of New York,* 62 N.Y.2d 548, 554 n. 2 & 555 n. 4, 468 N.E.2d 1, 4 nn. 2 & 4, 479 N.Y.S.2d 163, 166 nn. 2 & 4 (1984) (adopting the issue preclusion factors outlined in the Restatement), *cert. denied,* 469 U.S. 1210, 105 S.Ct. 1177, 84 L.Ed.2d 326 (1985).

The action at bar was commenced in 1979, several years before the state court decisions in *Lewis* and *Overton.* Therefore, defendants had a strong incentive, as well as a fair opportunity, to contest the haircut issue fully in the New York State courts, recognizing that any determination might have a preclusive effect in the pending federal action. *See Winters v. Lavine,* 574 F.2d 46, 59 n. 14 (2d Cir.1978).

Defendants urge that nonmutual offensive collateral estoppel cannot be invoked against the government. *See United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). The *Mendoza* Court declined to apply offensive issue preclusion against the federal government, finding that certain policy considerations weighed against preclusion in that case. *Id.* at 160–61, 104 S.Ct. at 572–73. Significantly, the Solicitor General had decided not to appeal a previous adverse judgment, *id.* at 159, 161, 104 S.Ct. at 572, 573, unlike the situation here, where the defendants appealed two prior judgments resolving the same issues to the state's highest court.

The major policy interests outlined in *Mendoza* were avoidance of premature estoppel and assurance of an opportunity for the government to consider the administrative concerns that weigh against initiation of the appellate process. *Id.* Here, the issue percolated through the state courts and was decided by the New York Court of Appeals during the pendency of the case at bar. Decisions by several state courts assured defendants that preclusion was not premature, that proper review of the issues occurred prior to application of preclusion principles, and that the DOCS had the opportunity to consider appeal of the state court decisions in light of the pending federal action.

Lastly, defendants contend that a change in the governing constitutional standard since *Lewis* renders preclusion improper. We note that *Lewis* considered two levels of scrutiny and found that even under a standard more burdensome to the plaintiffs than the *Turner/Shabazz* reasonableness standard, plaintiffs would prevail. *Lewis,* 68 N.Y.2d at 924–25, 502 N.E.2d at 989, 510 N.Y.S.2d at 74. The decision in *Overton,* decided after pronouncement of the new standard, followed the mandate of the Supreme Court. *Overton,* 133 A.D.2d at 745, 520 N.Y.S.2d at 34.

In light of the foregoing, we find the district court properly gave preclusive effect to the prior state court proceedings.

## B. *Constitutionality of Directive 4914*

■ Defendants argue that the initial haircut is necessary for purposes of identification in the event of escape. Accepting the existence of reasonable security concerns, we find there is an alternative that can accommodate both parties. *See Turner,* 482 U.S. at 91, 107 S.Ct. at 2262. After reviewing the voluminous record and hearing testimony from both Rastafarian inmates and prison officials, the district court determined that pulling plaintiffs' hair

back met the purported security needs. *Benjamin,* 708 F.Supp. at 573. Great deference must be accorded the DOCS' position that this solution is inadequate. *Fromer,* 874 F.2d at 73. Defendants, however, have failed to establish that the accommodation here has more than a de minimis effect on valid penological interests. *Turner,* 482 U.S. at 91, 107 S.Ct. at 2262. In *Fromer,* it appeared that there was no alternative to shaving the appellant's beard to reveal his facial features properly. *Fromer,* 874 F.2d at 76. Here, however, tying plaintiffs' hair in pony tails adequately accommodates the interests of prison authorities in revealing an inmate's cranial and facial features.

Plaintiffs are permitted to regrow their hair to any length after the initial haircut. While defendants assert that this is an accommodation, this "misses the point of the violence done to [an inmate's] religious beliefs when his hair is cut." *Benjamin,* 708 F.Supp. at 573. Although length of hair makes identification difficult upon escape, a photograph of a Rastafarian when his hair is short would create the same identification problems, because he certainly will regrow his hair. The fact that inmates are rephotographed if their appearance changes drastically indicates that defendants believe they will be able to identify the plaintiffs from the new photographs. It is unclear how this is any different from identifying plaintiffs as they appear upon arrival. Accordingly, we find that there exists an alternative means of accommodating plaintiffs' religious rights without undermining the legitimate penological interests identified by the defendants.

III. Weekly Religious Congregation

Plaintiffs maintain they have been denied the right to congregate for weekly religious observance in violation of the free exercise clause of the first amendment, and that the prohibition is inconsistent with the permissible congregation of other religious groups in DOCS facilities. They further assert that section 610 of the New York Correction Law does not require outside clergy to conduct services but merely allows religious groups the right to have services conducted by outside clergy if available. Section 610 provides, in relevant part, that "inmates ... shall be allowed such religious services and spiritual advice and spiritual ministration from some recognized clergyman of the denomination or church which said inmates may respectively prefer or to which they have belonged prior to their being confined...." N.Y. Correct. Law § 610.

 The DOCS has interpreted section 610 to mean that inmate religious groups are permitted to congregate for religious observance only under the supervision of a non-inmate spiritual leader known as a "free-world sponsor." It has adopted Directive # 4760, entitled "Inmate Group Activities and Organizations," which is applicable to religious groups. Paragraph III(C)(3) of the Directive provides that a "[b]ona fide 'outside sponsor' is mandatory for each inmate organization." A bona fide sponsor is defined as:

> any individual or group duly registered and approved with the Volunteer Services Program that will visit the facility regularly to provide assistance to the inmate organization. A minimum of one visit per quarter is desired. In addition, ongoing communication with the facility Volunteer Services Office should be carried on. (All volunteer participants from the community must meet the registration and approval requirements of Directive # 4750, "Volunteer Services Programs.")

While it may be that the free-world sponsor requirement is inconsistent with the statutory language, determination of that issue is reserved for state courts. *Cf. Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). We must resolve whether the present interpretation of section 610 by DOCS is consistent with constitutional standards.

The sponsor requirement is said to be intended to ensure that the meeting is convened for religious purposes and not to hold kangaroo courts, foster extortion, or

provide a venue for the dissemination of conspiratorial information. As well, the use of sponsors is thought to minimize conflicts among inmates as to the nature and content of the service. Other circuits have given their imprimatur to the requirement of free-world sponsors based upon similar security concerns. *See, e.g., Johnson–Bey v. Lane,* 863 F.2d 1308, 1310–11 (7th Cir.1988); *Cooper v. Tard,* 855 F.2d 125, 129–30 (3d Cir.1988); *Hadi v. Horn,* 830 F.2d 779, 784–86 (7th Cir.1987); *Tisdale v. Dobbs,* 807 F.2d 734, 736, 740 (8th Cir.1986). We also are satisfied that the sponsor requirement meets the rational relationship and impact of accommodation prongs of the *Turner* standard.

Applying the second *Turner* prong, alternative means, it appears that plaintiffs are not prohibited from "reasoning," a form of religious discussion, as an alternative means of prayer. *Cooper,* 855 F.2d at 129–30. In fact, part of the Rastafarian service consists of reasoning. As long as plaintiffs are permitted to engage in such discussion, they have other means of exercising their right of congregate prayer.

As to the fourth prong, availability of ready alternatives, defendants have suggested that they might accept an outside "Elder" as a free-world sponsor. An Elder is not a clergyman but retains authority as a result of his education and familiarity with the Rastafarian religion. Any objection to the authority of an Elder, simply because the Rastafarian religion lacks conventional clergyman, would be unwarranted. In view of the legitimate security reasons supporting the free-world sponsor requirement, the failure of an outside Elder to come forward cannot justify the finding of a first amendment violation. The inmates' proposal that a non-religious supervisor be used would not resolve the doctrinal disputes that are the subject of security concerns. *See Hadi,* 830 F.2d at 786–87.

Similarly, we are not persuaded that the free-world sponsor requirement violates plaintiffs' right to equal protection of the laws. The plaintiffs argue that defendants have permitted the use of inmate Imams to conduct Muslim services and therefore they

should be accorded the same privilege. This contention, however, fails to recognize the reason for the free-world sponsor requirement. It is not the presence or absence of the sponsor at the service that is the concern but rather the availability of an outside ministerial authority in religious matters.

The requirement of an outside resource is compelled by the defendants' concern that the authenticity of the service will be compromised or that particular religious issues may arise which cannot be resolved by DOCS staff. Thus, the defendants have expressed a rational basis for requiring outside sponsors even if the sponsors are not required to attend every service. The DOCS has an outside resource to contact with respect to Muslim and Buddhist services, and it indicated that it would "allow Rastafarians to hold congregate services when and if ... an outside sponsor comes forth." *Benjamin,* 708 F.Supp. at 576.

The apparent unavailability of a Rastafarian Elder or similar religious authority willing to serve as an outside sponsor is not the fault of the defendants. Had the plaintiffs proved that the DOCS arbitrarily rejected available sponsors, then a cognizable claim might exist. However, the district court found that the defendants have made a good faith effort "to locate and obtain the services of a sponsor." *Id.* at 576–77. We agree with the district court that the free-world sponsor requirement does not violate equal protection because it has a legitimate basis and is imposed on all religious groups.

## IV. The Wearing of Crowns

■■■ We next address the constitutionality of the DOCS regulations which restrict the wearing of crowns to designated areas. From the perspective of first amendment analysis, legitimate security reasons are raised in support of present policy. Preventing the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the *Turner/Shabazz* standard. *See Turner,* 482 U.S. at 89, 107 S.Ct. at 2261. We have examined each prong of the first amendment analysis and

find plaintiffs' claim to be without merit. *See, e.g., Standing Deer v. Carlson,* 831 F.2d 1525, 1528 (9th Cir.1987); *Rogers v. Scurr,* 676 F.2d 1211, 1215 (8th Cir.1982).

Jewish inmates are permitted to wear yarmulkes throughout DOCS facilities, and Muslim prisoners may wear kufis. The right of Rastafarians to wear crowns, however, is limited, and in some facilities crowns are wholly prohibited. Plaintiffs contend that the unlimited right granted Jewish and Muslim inmates, as opposed to Rastafarian prisoners, to wear religious headgear establishes an equal protection violation. We disagree.

The district court found that crowns are large and loose-fitting, providing a readily available means for "concealing and transporting weapons, controlled substances or other contraband, thus posing a threat to prison security." *Benjamin,* 708 F.Supp. at 574. While security problems may exist with respect to yarmulkes and kufis, defendants maintain that a heightened security concern is posed by crowns, because of the size of the headgear and the ease with which contraband can be secreted. Here, legitimate security interests have been raised by the prison authorities, who must be accorded great deference in these matters. *Turner,* 482 U.S. at 84–85, 107 S.Ct. at 2259–60.

The fact that the defendants are willing to conduct spot searches of Jewish and Muslim inmates does not mean that they are required to do the same for all prisoners claiming a right to wear headgear. The prison officials justifiably expressed the belief that crowns presented a greater danger than yarmulkes and kufis. The greater security concern associated with the wearing of crowns, including the enhanced potential for concealing contraband and the obvious increase in guard/inmate contact that would result from searches of crowns, provides a rational basis for treating the plaintiffs differently from the other religious groups with respect to headgear. *See North Carolina Prisoners' Union,* 433 U.S. at 136, 97 S.Ct. at 2543. The district court found that "yarmulkes and kufis are smaller and fit closely to the head, while the crown is of a size and shapelessness which would facilitate uses which are legit-imately forbidden." *Benjamin,* 708 F.Supp. at 574. Accordingly, we find no merit to plaintiffs' contention that the restriction imposed on the wearing of crowns violates their equal protection rights.

## V. Ital Diet

■ Rastafarians observe a diet called Ital, which "symbolizes a belief in life and an avoidance of symbols of death." *Benjamin,* 708 F.Supp. at 575. The exact nature of the Ital diet varies among individuals and Rastafarian sects. *Id.* The district court denied plaintiffs' dietary claim, determining that the varied individual practices "would impose undue financial and administrative burdens on defendants." *Id.* Although it appears that plaintiffs originally sought a strict Ital diet, they now "ask that their dietary needs be accommodated in a way similar to that defendants have already adopted for other religious groups." On appeal, plaintiffs advance an equal protection challenge, asserting that similar dietary requests have been granted to other religious groups.

Prisoners have a right "to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975). Courts, however, are reluctant to grant dietary requests where the cost is prohibitive, *see Martinelli v. Dugger,* 817 F.2d 1499, 1507 & n. 29 (11th Cir.1987), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988); *Kahey v. Jones,* 836 F.2d 948, 951 (5th Cir.1988), or the accommodation is administratively unfeasible, *see Kahey,* 836 F.2d at 951; *Kahane,* 527 F.2d at 495.

The dietary programs presently in effect are well-defined. Muslim inmates are provided the alternatives to pork available to all inmates, and receive a special dietary accommodation during the month-long Muslim holiday of Ramadan. During Ramadan, Muslims are permitted to prepare and eat food in their cells, but the foodstuffs they receive are those served to the entire prison population. In order to accommodate the dietary habits of Orthodox Jewish inmates, a kosher dietary plan is provided at the Green Haven facility; and neutral diets, consisting mainly of canned goods, eggs, and occasionally fresh vegeta-

**580**

bles, are provided at other facilities as alternatives to the kosher dietary plan.

Plaintiffs now seek a "vegetarian diet with foodstuffs that their faith permits them to eat." They also contend that a kosher diet would "substantially meet their religious need." Notwithstanding this attempted clarification, the varied nature of the Ital diet raises questions as to the foodstuffs that will satisfy their request. This problem exists because Rastafarians will not consume canned goods, and fresh fruits and vegetables have a limited availability and are not cost-effective. *Benjamin,* 708 F.Supp. at 575.

We remain uncertain as to the exact nature of the dietary request, which has varied during the course of this litigation. Based on the present state of the record, we find that the dietary claim must be rejected because plaintiffs have failed to clearly define the claim or to make the evidentiary showing required to establish any constitutional dietary claim.

### CONCLUSION

For the foregoing reasons, we affirm. No costs are awarded to either side.