**LaShawn WITHROW, Plaintiff,**

v.

**George J. BARTLETT, et al., Defendants.**

No. 96–CV–6305L.

United States District Court,
W.D. New York.

July 16, 1998.

Michael Jensen, all of Elmira. Plaintiff moved for summary judgment and defendants filed a cross-motion for summary judgment.

On June 8, 1998, plaintiff filed a document entitled "Amended Complaint," (docket # 28), to which defendants have filed an answer. (Docket # 29). Although technically, plaintiff did not seek leave of this Court to amend his complaint, pursuant to Fed. R.Civ.P. 15(a), I will grant plaintiff leave to amend. Defendants have renewed their motion for summary judgment as to the amended complaint.

For the reasons discussed *infra*, plaintiff's motion for summary judgment is denied, defendants' cross motion for summary judgment is granted, and the amended complaint is dismissed.

## PLAINTIFF'S CLAIMS

Plaintiff claims that he was denied the right to practice his religion at the Elmira Correctional Facility on a particular day, December 31, 1995.

Plaintiff's complaint alleges that on the afternoon of December 31, 1995, defendant Correctional Sergeant Michael Jensen was supervising the Elmira field house. Plaintiff, a Muslim, was in the recreational area of the field house at the time, engaged in an act of religious worship with three other Muslim inmates. Specifically, he alleges that they were chanting, kneeling, and bowing to the east in fulfillment of the late afternoon prayer, as required under the Islamic faith.

Plaintiff claims that he had, on previous occasions engaged in this afternoon prayer ritual by himself, and that correctional officers had witnessed his actions. He alleges that he had not come into conflict with correctional staff on earlier occasions, and as-

LaShawn Withrow, Alden, NY, pro se.

Paul O. Harrison, New York State Attorney General's Office, Dept. of Law, Rochester, NY, for George J. Bartlett, D.G. Aidala, M. Jensen, defendants.

### *DECISION AND ORDER*

LARIMER, Chief Judge.

### BACKGROUND

Plaintiff LaShawn Withrow,[1] appearing pro se, commenced this action under 42 U.S.C. § 1983.[2] Plaintiff, who is currently an inmate at Wende Correctional Facility, alleges that while he was incarcerated at Elmira Correctional Facility ("Elmira"), the defendants violated his constitutional rights by denying him the freedom to practice his religion. Specifically, plaintiff claims that he was disciplined for engaging in prayers that are mandated by the Muslim faith.

The three defendants, and the positions they held at all relevant times, are: former Superintendent George J. Bartlett, Captain Dana G. Aidala, and Correctional Sergeant

---

1. Plaintiff refers to himself in this action as "LaShawn Withrow." The New York State Department of Correctional Services ("DOCS") records also list plaintiff under the names "Withrop" and "Winthorp." Under all of the alternative names plaintiff has used, he is identified by inmate identification number 94 A 4487.

2. Plaintiff filed this action in the Northern District of New York, in case number 96–CV–661. On June 13, 1996, the action was transferred to this district.

sumed that he was free to engage in the group prayer without repercussions.[3]

Defendant Jensen observed the activity, determined that it was unauthorized demonstrative prayer, and warned the inmates to stop.[4] Plaintiff claims that he stopped praying to produce his identification card at Jensen's request. Plaintiff then told defendant Jensen that he had a right to conduct the prayers in the recreational area (based on case law and institutional rules), and he requested that Jensen make accommodations for Muslim inmates who wished to go back to their cells and pray during recreation time but thereafter return to the yard. Defendant Jensen rejected plaintiff's protests and instead issued plaintiff a misbehavior report. Plaintiff was charged with violating Rules 106.10 (refusing a direct order) and 105.11 (unauthorized religious addresses).

Following a Tier II hearing on January 5, 1996, plaintiff was found guilty of the violations and sentenced to 15 days in keeplock status as well as 15 days' loss of telephone, recreation, package, and commissary privileges. Plaintiff appealed the disciplinary hearing, claiming that he had not made a religious address or performed a religious service in the yard, and that the prison's refusal to authorize inmates' prayer in the recreational yard violated the First Amendment. Defendant Captain Dana Aidala, a designee of defendant Superintendent Bartlett, affirmed the Tier II hearing decision on January 17, 1996.

## DOCS POLICIES REGARDING INMATE RELIGIOUS PRACTICES

According to defendant George Bartlett's affidavit, it is DOCS policy to allow inmates to engage in prayer, so long as the correctional facility can still maintain order. (Docket # 17, Exh. A). DOCS policies permit Muslim inmates to pray five times a day, as required by the religion.

DOCS has established rules and directives to govern all inmates' religious practices. Rule 105.11 states: "Religious services, speeches or addresses by inmates other than those approved by the Superintendent or designee are prohibited." DOCS Directive 4202, which was adopted in 1988 and pertains to religious programs and services, provides as follows:

1. Individual demonstrative prayer by inmates will be allowed only in the privacy of their own living quarters and in the designated religious areas whenever feasible, as determined by the Superintendent.

2. Congregate or group prayer may only occur in a designated religious area during a religious service or at other time authorized by the Superintendent.

   Demonstrative prayer will be allowed only to the extent that it is not disturbing to others.

DOCS defines "demonstrative prayer" as individual prayer that involves movement, position changes, calls, or audible chants. In terms of what constitutes "disturbing," defendant Bartlett states in his affidavit that, once the prayer becomes noticeable, it is considered disturbing to others. Additionally, prayer is disturbing if it upsets the order of the prison or has the potential to do so.

Bartlett further states that demonstrative prayer and group prayer, which pose risks of disturbing inmates, are only permitted in designated areas, in order for the prison to minimize security risks. As a general rule, demonstrative prayer is permitted at an Muslim inmate's bedside, in his cell, in the designated area (called a Mosque but more appropriately referred to as a *Musallah,* a prayer room), or in any other area that the Superintendent designates for such purposes. No inmates are permitted to engage in group or demonstrative prayer in the recreation yard, mess halls, hallways, or work areas.

---

**3.** Plaintiff alleged this point in his response to the defendants' cross motion for summary judgment. (Docket # 28). However, in the same response, he alleged that Muslim inmates at Elmira are prohibited from praying in the yard on an individual or group basis.

**4.** According to the ticket, plaintiff and the other three inmates refused Jensen's orders and continued to chant for approximately two more minutes.

The Directives permit inmates to engage in nondemonstrative prayer in the yard, but the yard is not an area designated for prayer. Since an inmate engaged in nondemonstrative prayer is silent and not moving, however, and the risk of his disturbing someone else is minimal, it is not possible to discern that he is praying under these circumstances. As an alternative to nondemonstrative prayer, the inmate may return to his cell during a recreation period (this is known as requesting a "go back"), or, he may go to a designated area, in order to engage in demonstrative prayers.

Defendant Bartlett states that, during his tenure as Superintendent of Elmira, he did not authorize the field house recreation area as an approved site for demonstrative congregate religious prayer, and group prayer sessions in this area were prohibited for inmates of any religion. Muslim group prayer was allowed in the Mosque on Friday afternoons and supervised Muslim study groups were held on Saturdays.

## DISCUSSION

### A. Summary Judgment Standard

The standards for deciding a summary judgment motion under Fed.R.Civ.P. 56 are well established. Summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under the rule, the burden is on the moving party to inform the Court of the basis for the motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has carried that burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, "the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) (alteration in original)). At the summary judgment stage, when perusing the record to determine whether a rational fact-finder could find for the nonmovant, the Court must draw all reasonable inferences in favor of the nonmovant. *See Murray v. National Broadcasting Co.,* 844 F.2d 988, 992 (2d Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

### B. The First Amendment Claim

██ Prisoners have a constitutional right to participate in congregate religious services. *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989). Yet, a prisoner's right to practice his religion is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990). Constitutional protections extend to prisoners insofar as the inmates must be given "reasonable opportunities ... to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s]." *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).

██ The standard set forth in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), for assessing a claim that prison officials impermissibly infringed on an inmate's free exercise of religion, requires the Court to consider whether the officials' conduct "is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254; *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 353, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Specifically, four factors must be considered:

(1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; (2) whether the inmates have alternative means to exercise the right; (3) the impact that accommodation of the right will have on the prison system; and (4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Salahuddin v. Coughlin,* 993 F.2d 306, 308–09 (2d Cir.1993) (quoting *Benjamin,* 905 F.2d at 574).

■ Although plaintiff's claims seem to vary from document to document, it must be remembered that he was disciplined not for praying silently to himself nor even for engaging in solitary demonstrative prayer, but for engaging in group prayer in the prison recreation yard, a place not authorized for such religious activity.

I find, upon review of all the pleadings, that plaintiff's First Amendment rights were not violated by defendant Jensen, who issued the misbehavior report, Aidala, who affirmed the misbehavior report, or Bartlett, who allegedly condoned the officers' acts. Plaintiff's First Amendment claim must therefore be dismissed.

### 1. Rational relation to a legitimate penological interest

With regard to the first factor under the First Amendment analysis, the facts indicate that defendants had a legitimate penological interest in prohibiting all inmates from engaging in group demonstrative prayer in the recreational yard. The maintenance of institutional security has long been recognized by courts as a legitimate penological interest. *O'Lone*, 482 U.S. at 353, 107 S.Ct. 2400; *Jolly v. Coughlin*, 76 F.3d 468, 475 (2d Cir. 1996). Rule 105.11 and Directive 4202 restrict inmate led religious services and group demonstrative prayer to areas designated by the Superintendent.

In his affidavit, (Exhibit C to Defendants' Motion for Summary Judgment [Dkt. # 17] ¶ ¶ 10–15), Superintendent Bartlett listed several reasons for restricting demonstrative and group prayer to designated areas. Specifically, he set forth reasons why this prayer was not allowed in the recreational area. He believed that there was a greater risk of inmate conflict when a religious activity, as opposed to a recreational game, was disturbed by other inmates. Disturbances could be provoked by inmates engaging in demonstrative prayer at inappropriate times and places. Furthermore, this activity had a potential for creating a diversion in the yard to help facilitate an escape or other illegal activity.

Furthermore, the recreational yard at Elmira is quite crowded. Each day between 300 and 500 inmates gather in the yard, which generally is monitored by only two correctional officers. Group. conflicts can arise in this setting and there are few correctional officers to deal with the matter.

Non-demonstrative prayer is allowed in the yard. By definition, this prayer is silent and does not involve any movement by the inmate. Therefore, the risk of disturbing other inmates is minimal and, of course, it is very difficult for correctional officers to detect.

During a recreational period, an inmate may request to return to his cell or go to an approved area, to engage in demonstrative prayer.

I find that restrictions against group demonstrative prayer are necessary in order to maintain prison security; inmates engaged in demonstrative prayer in the highly populated yard pose the risk of disturbing other inmates with their chanting and movements, and demonstrative prayer performed in a group manner only serves to increase the risk of disruption.

I find that defendants had a legitimate penological interest in maintaining security, and that this interest was rationally related to their enforcement of policies that prohibit group demonstrative prayer in Elmira's recreational yard.

### 2. Alternative means of exercising the right to religious freedom

As to the second factor in this assessment—whether defendants offered plaintiff alternative means of exercising his religious freedom—I find that plaintiff had many opportunities at the facility to fulfill his daily prayer requirements, individually and in a group setting, outside of the prison yard. It is clear that plaintiff, and the many other Muslims in the prison population, could satisfy their religious requirements without the need to do so in the crowded recreational yard. Plaintiff's preference to pray in the recreational yard with other Muslims does not create a constitutional right to do so in light of the other alternative means available to exercise his religion.

In support of their cross-motion for summary judgment, defendants submitted the

affidavit of Imam Warith Deen Umar, who was the ministerial program coordinator and an Islamic affairs specialist employed by DOCS. Imam Umar is a practicing Muslim and the highest ranking Muslim chaplain in the New York State correctional system. He indicated in his affidavit (Ex. C to Defendants' Cross-motion for Summary Judgment [Docket No. 17]) that there were many Muslims in the New York State prison population (approximately 18.5% of the population) and that he supervised approximately forty-three Imams throughout the seventy-one DOCS facilities.

According to Imam Umar, DOCS has established programs for Muslim inmates, and those programs do accommodate the inmates' five daily religious obligations. As Umar indicated in his affidavit, the five daily prayer requirements can be met by way of formal prayer or informal prayer, if formal prayer is not practical at a particular time and place. The formal prayer can be made up at another time. Inmates may pray when they wake, at various times during the day in their cells, and at night before they sleep. Plaintiff was allowed to go back to his cell during the recreational period, where he could engage in demonstrative prayer, or he could participate in group prayer in the Mosque or attend Muslim study groups at designated times and places. Plaintiff also had the option to remain in the yard, perform nondemonstrative prayer there, and make up his formal prayer obligation at some other time.

■ Plaintiff does not dispute the fact that he could engage in group prayer in the designated areas of the prison for such activity, and he does not dispute the fact that he could pray in his cell in order to fulfill his daily prayer obligations. Plaintiff seems to claim that Jensen was required under the First Amendment to accommodate his request on December 31, 1995, to leave the recreation area to pray in his cell and then return to the recreation area to complete his recreation. On the facts presented here, however, no such accommodation was required. The fact that plaintiff may have "lost" some of his recreation time because he elected to return to his cell for prayer is of little moment in determining whether his First Amendment constitutional rights were violated.

The focus of the Court's First Amendment inquiry, however, is whether plaintiff was offered adequate alternative opportunities to fulfill his faith requirements, and not whether plaintiff's alleged inability to return to the yard after a "go back" to his cell to pray represented an unreasonable situation. The facts indicate that plaintiff could spend his yard time by remaining there to exercise, to engage in other recreation, or to conduct nondemonstrative prayer. Additionally, he could use the "go back" option to fulfill his formal prayer obligation in his cell. Based on these facts, I conclude that he had many reasonable, alternative ways in which to exercise his religious freedom, aside from conducting a group demonstrative prayer in the yard.

### 3. Impact of the requested accommodation on the prison system

Regarding the third factor, the impact of the requested accommodation on prison guards and allocation of resources, I find that the balance weighs in favor of the Superintendent's decision to ban the yard as a place for group congregate worship. As Superintendent Bartlett indicated in his affidavit, the Elmira recreation yard is usually occupied by 300–500 inmates, and only two correctional officers are assigned to monitor their activities. The accommodation of any one religious group's request to conduct a demonstrative prayer session in the yard poses a security risk, because such activity, which involves chanting, calling, or body movements, could easily disrupt the recreational activities of other inmates.

Moreover, the defendants' alleged rejection of plaintiff's request to return to the yard after engaging in individual prayer in his cell is also reasonable, in light of the impact such an accommodation would have on prison resources. Elmira's accommodation of every inmate's request to go back to their cells and pray, and then return for the remainder of the recreation period, would be difficult, and an unnecessary measure, since the "go back" option is already an accommodation for, *inter alia*, the religious obli-

gations of inmates. *See O'Lone*, 482 U.S. at 351, 107 S.Ct. 2400 (upholding prison policy prohibiting Muslim inmates from returning to housing buildings during work time, based in part on pressures the accommodation would impose on correctional officers who supervised work procedures). I find that there is no genuine issue of material fact as to the negative impact of the requested accommodation on prison resources.

#### 4. Absence of ready alternatives

The final factor which is considered is whether there are alternatives that would accommodate the inmate but also be consistent with DOCS' legitimate concerns. As discussed above, plaintiff's suggested accommodations (allowing group demonstrative prayer in the yard or allowing inmates to return from their cells after engaging in prayer) seriously affect the legitimate interests in maintaining security and order at the institution. In light of the other options offered by DOCS for Muslims to satisfy their religious requirements, plaintiff has failed to establish a demonstrated need for the further accommodations that he wishes to impose on DOCS. In this case, there is no genuine issue of fact as to the adequacy of the alternatives that are in place for plaintiff to exercise his religious beliefs. *See O'Lone*, 482 U.S. at 350, 107 S.Ct. 2400 (rejecting notion that State must set up and shoot down every possible alternative in order to satisfy constitutional test).

Based on the above, I find that plaintiff's First Amendment rights were not violated by the defendants' restriction against group demonstrative prayer. His First Amendment claim is, accordingly, dismissed.[5]

#### C. The Due Process Claim

■ Plaintiff also claims that the defendants, by disciplining him for engaging in group demonstrative prayer on December 31, 1995 in the Elmira yard, and thereafter transferring him to Clinton Correctional Facility, unconstitutionally retaliated against him for exercising his First Amendment rights.

For several reasons, this claim must be dismissed. Plaintiff was not, in fact, engaging in protected activity and, therefore, the disciplinary tickets issued to him were proper. Furthermore, it is not alleged that any of the defendants here were involved in any matter with plaintiff's transfer. In addition, plaintiff's claims are wholly conclusory and without any factual basis.

■ Substantive due process protects prisoners against government action that is arbitrary, shocking to the conscience, or oppressive. *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994). The Second Circuit has held, moreover, that an inmate has a substantive due process right to be free from false misbehavior charges and harassment brought in retaliation for the exercise of a constitutional right. *Jones v. Coughlin*, 45 F.3d 677, 679–80 (2d Cir.1995).

The plaintiff, however, bears the burden of showing that the conduct was "constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996). Additionally, since retaliation claims by prisoners are often prone to abuse, they should be viewed with skepticism, and the Second Circuit requires a higher level of detail in pleading. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983); *Davis v. Kelly*, 981 F.Supp. 178, 181 (W.D.N.Y.1997). When a prisoner's retaliation claim is wholly conclusory, it can be dismissed on the pleadings alone. *Davis*, 981 F.Supp. at 181 (citing *Flaherty*, 713 F.2d at 13).

---

**5.** In his motion for summary judgment, plaintiff discusses an incident that occurred in March 1997 at another correctional facility involving an altercation that occurred among a group of inmates. Based on this altercation, plaintiff received a disciplinary report and, following a hearing, was found guilty and sentenced to special housing unit confinement. The matter occurred over fifteen months after plaintiff's incident at Elmira and does not involve any of the named defendants in this lawsuit.

Plaintiff did not include this incident in either his original complaint or the amended complaint that was most recently filed. Therefore, there is no basis to consider the matters discussed by plaintiff in his summary judgment motion since they have never been pleaded as part of plaintiff's complaint.

As to the December 31, 1995 incident, plaintiff's retaliation claim must be dismissed. Although, plaintiff alleges that the conduct he was engaged in, group demonstrative prayer, was a constitutionally protected activity, it in fact was not protected, because he did not have a constitutional right to engage in such activity with other inmates, in a location that was not designated by the Superintendent for that purpose. Moreover, there is no genuine issue of material fact concerning the events that led to defendant Jensen's issuance of the misbehavior report; plaintiff was chanting and otherwise engaged in demonstrative prayer with three other inmates in the yard, in violation of Rule 105.11 and he disobeyed Jensen's direct order to stop the activity. His substantive due process rights were not violated. *See Lowrance*, 20 F.3d at 537 (inmate's substantive due process rights not violated where discipline resulted from his refusal to obey order of correctional officer).

Furthermore, plaintiff has failed to allege any specific personal involvement of defendants Bartlett, Aidala, concerning his subsequent transfer to Clinton Correctional Facility. Under similar circumstances, the Supreme Court recognized that where a complaint contained no allegation or basis to infer personal involvement of the defendants in the alleged constitutional deprivation, the plaintiff could make no rational argument to support his claims for relief; it thus found that the Court of Appeals had correctly held that "the District Court had appropriately dismissed those claims as frivolous." *Neitzke v. Williams*, 490 U.S. at 323, 109 S.Ct. 1827.

## CONCLUSION

For all of the above reasons, defendants' motion for summary judgment (docket # 17) is granted in its entirety as to all defendants; plaintiff's motion for summary judgment is denied (docket # 13); and the complaint is dismissed.

IT IS SO ORDERED.